**BLUE DIAMOND COAL COMPANY,**
Plaintiff-Appellee,

v.

**UNITED MINE WORKERS OF AMERICA,** Defendant-Appellant.

No. 19589.

United States Court of Appeals, Sixth Circuit.

Dec. 15, 1970.

Harrison Combs, Washington, D. C., for defendant-appellant. Edward L. Carey, Harrison Combs, Willard P. Owens, Washington, D. C., H. B. Noble, Hazard, Ky., M. E. Boiarsky, Charleston, W. Va., on brief.

James S. Greene, Jr., Harlan, Ky., for plaintiff-appellee; Logan E. Patterson, Patterson & Berger, Pineville, Ky., James S. Greene, Jr., Harlan, Ky., on brief.

Before CELEBREZZE and McCREE, Circuit Judges, and O'SULLIVAN, Senior Circuit Judge.

O'SULLIVAN, Senior Circuit Judge.

The United Mine Workers of America appeal from a judgment entered upon a jury verdict awarding appellee, Blue Diamond Coal Company, $281,990.57 as damages for alleged breaches of the collective bargaining contract between Blue Diamond and the UMW. The breaches claimed consisted of strikes—work stoppages—that occurred during 1962 and 1963. Action was brought under § 301 of the Labor Management Relations Act of 1947, 29 U.S.C. § 185. The damages awarded were based upon plaintiff's evidence of the losses it claimed to have sustained by reason of work stoppages allegedly caused or condoned by international representatives of the United Mine Workers. Our use of the initials UMW, the Union, or the Mine Workers, shall mean the parent international union. Relevant parts of subsections of the Act, 29 U.S.C. § 185, are as follows:

"(a) Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.

"(b) Any labor organization which represents employees in an industry affecting commerce as defined in this chapter and any employer whose activities affect commerce as defined in this chapter shall be bound by the acts of its agents. * * *

"(e) For the purposes of this section, in determining whether any person is acting as an 'agent' of another person so as to make such other person responsible for his acts, the question of whether the specific acts performed were actually authorized or subsequently ratified shall not be controlling."

Appellant Mine Workers here charge error in the District Court's denial of its motions for a directed verdict, for judgment n. o. v. and for a new trial. To support its claim that it was entitled to a direction, it asserts that the contract between it and Blue Diamond did not

forbid the work stoppages that did occur; that there was not sufficient evidence to warrant submission, for the jury's resolution, the responsibility of the United Mine Workers of America for such work stoppages; and that the evidence did not provide a measure of damages from which a monetary award could be made. Its alternative motion for new trial relied on all of the foregoing in addition to a claim that the jury's verdict was against the weight of the evidence, was excessive, its amount was not supported by adequate and admissible evidence, and that the Court erred in its instructions to the jury. We shall discuss these assignments of error as follows:

### 1. Was the bargaining contract violated.

█ Appellant argues that even if the UMW participated in, and was responsible for, the work stoppages, such stoppages did not violate the contract. Blue Diamond claims that it was agreed that whatever dissatisfactions precipitated the stoppages, it was the contracted duty of the UMW and all of its members employed by Blue Diamond to resolve these difficulties through the established grievance procedures, ending if necessary with binding arbitration without resort to strikes or work stoppages. The District Judge sustained the position of Blue Diamond and, in submitting the case to the jury, told them:

"At the time and upon the occasions detailed in the evidence, it was the contractual duty of the defendant Union to settle and resolve all disputes, troubles, and grievances at the plaintiff's mine by the procedures as set out in the contract by the parties, rather than to resort to strikes or other pressures. If you believe from the evidence that the defendant Union induced, encouraged, prolonged or ratified any of the strikes, described in the evidence, or induced, encouraged, prolonged or ratified a deliberate program of non-cooperation designed and intended to injure the plaintiff company,

then to the extent you so believe you should consider the defendant Union to have breached its contract, and you should find for the plaintiff, * * *; but unless you so believe the defendant Union breached its contract, you should find for the defendant."

The contract in force at the time of the work stoppages was the National Bituminous Wage Agreement of 1950, as amended in 1958. It contained the following:

"The United Mine Workers of America and the Operators agree and affirm that they will maintain the integrity of this contract and that all disputes and claims which are not settled by agreement shall be settled by the machinery provided in the 'Settlement of Local and District Disputes' section of this Agreement unless national in character in which event the parties shall settle such disputes by free collective bargaining as heretofore practiced in the industry, it being the purpose of this provision to provide for the settlement of all such disputes and claims through the machinery in this contract provided and by collective bargaining without recourse to the Courts.

\* \* \* \* \* \*

"**Settlement of Local and District Disputes.**

"Should differences arise between the Mine Workers and the Operators as to the meaning and application of the provisions of this Agreement, or should differences arise about matters not specifically mentioned in this Agreement, or should any local trouble of any kind arise at the mine, an earnest effort shall be made to settle such differences immediately:

1. Between the aggrieved party and the mine management.
2. Through the management of the mine and the Mine Committee.
3. Through District representatives of the United Mine Workers of America and a commissioner representative (where employed) of the coal company.

4. By a board consisting of four members, two of whom shall be designated by the Mine Workers and two by the Operators.

5. Should the board fail to agree the matter shall, within thirty (30) days after decision by the board, be referred to an umpire to be mutually agreed upon by the Operator or Operators affected and by the duly designated representatives of the United Mine Workers of America, and the umpire so agreed upon shall expeditiously and without delay decide said case. The decision of the umpire shall be final. Expenses and salary incident to the services of an umpire shall be paid equally by the Operator or Operators affected and by the Mine Workers.

"A decision reached at any stage of the proceedings above outlined shall be binding on both parties hereto and shall not be subject to reopening by any other party or branch of either association except by mutual agreement."

The UMW argues that notwithstanding such provision, the contract did not outlaw the use of work stoppages as a means of resisting impairment of the rights of employees, or as a method of vindicating them. This is so, appellant argues, notwithstanding the contract's clear language that,

"All disputes and claims * * * *shall* be settled by the machinery provided in the 'Settlement of Local and District Disputes' section of this Agreement."

The basis of this argument is that early contracts between the UMW and Blue Diamond had "no strike" clauses and used the word "exclusively" in setting out that disputes would be settled by the contract's grievance procedure; that the elimination of such clauses evidenced the contract's intention that strikes to enforce employees' demands would not violate the contract; and that the stipulation that *"all* disputes *shall* be settled by the machinery provided" was no more than a "gentleman's agreement" unenforceable at law.

We are of the view that this Circuit has held such contention invalid. In Lewis v. Benedict Coal Corp., 259 F.2d 346 (6th Cir. 1958), affirmed by an equally divided Supreme Court, 361 U.S. 459, 80 S.Ct. 489, 4 L.Ed.2d 442 (1960), Mr. Justice Potter Stewart, then a member of this Court, held that the express elimination of the "no strike" clauses that had been contained in earlier standard contracts negotiated by the Mine Workers, did not render unenforceable the above expressed obligation to settle *all* disputes through the current contracts. There it was stated:

"It is true that the agreement expressly stated that the 'no strike' provisions of the previous contracts were superseded. However, the agreement provided in detail the procedure to be followed for the settlement of localized disputes or grievances." 259 F.2d at 350.

It is true that in the contract before us in *Benedict Coal,* the word "exclusively" was employed relative to the obligation of both parties to use the grievance procedure. It provided that disputes "shall be settled and determined *exclusively* by the machinery provided in the 'Settlement of Local and District Disputes' section of this Agreement." We, however, do not consider that the elimination of such word, any more than the express abrogation of the "no strike" clauses in *Benedict Coal,* rendered the clear language of the contract before us—that disputes *shall* be settled through the grievance procedure—mere words of exhortation. At the time Justice Stewart wrote in *Benedict Coal,* the standard UMW contract had, in 1952, been revised to eliminate the word "exclusive" and some other provisions. Of this Justice Stewart said:

"These sections [Settlement of Local and District Disputes] were revised in the 1952 amendment, but the ob-

ligation to resort to the specified procedure was not substantially changed." 259 F.2d 350.

By footnote to the above, Justice Stewart set out the exact relevant language of the contract now before us, in which the word "exclusively" had been deleted, emphasizing that such deletion did not substantially change the obligations of the contracting parties. This Court's opinion continues:

"Determination of this preliminary issue thus depends upon what effect the agreement to settle all local disputes in accordance with the 'Settlement of Local and District Disputes' procedure had upon the right to strike which was expressly preserved in the 1950–52 agreement. The question is not without precedent. The same basic issue was thoroughly considered in United Construction Workers v. Haislip Bakery Co., 4 Cir., 1955, 223 F.2d 872, 873; W. L. Mead, Inc. v. International Brotherhood of Teamsters, etc., D.C., 126 F.Supp. 466, affirmed 1 Cir., 1956, 230 F.2d 576; and International Union, United Mine Workers of America v. National Labor Relations Board, [103 U.S.App.D.C. 207,] 257 F.2d 211. With all respect for the majority view expressed in the latter decision, we agree with the dissenting judge in that case, and with the decisions in the Haislip and Mead cases, that a strike to settle a dispute which a collective bargaining agreement provides shall be settled by an exclusive and obligatory alternative procedure constitutes a violation of the agreement." 259 F.2d at 351.

As stated, we expressed our agreement with the dissent in International Union, United Mine Workers of America v. National Labor Relations Board, 103 U.S. App.D.C. 207, 257 F.2d 211 (1958). There the UMW made the same contention as to the effect of the elimination of a "no strike" clause contained in earlier contracts. Mr. Chief Justice Burger, then a member of the District of Columbia Circuit, writing in dissent, said:

"The majority opinion rests its reversal of the Labor Board action on the ground that the collective bargaining contract does not contain an affirmative 'no strike' clause, but it overlooks what the contract does contain, namely a solemn agreement by both parties to submit all disputes to an agreed process of negotiation leading finally to a binding arbitration if the preliminary steps are not successful. The mutual promises to settle all grievances by this peaceful process are plain and unambiguous, and this indeed is not disputed."

* * * * * *

"I cannot accept the view of the majority that these explicit detailed contractual provisions represent merely a loose 'gentleman's agreement' that the parties will try to resolve their problems without strikes or lockouts; to me they are the words of contracting parties who intend to set up binding provisions for what experience has taught is effective machinery for the day to day bargaining between management and employees. They are the words of enlightened union and management leaders who intend to abandon brutal and wasteful methods and substitute negotiation and arbitration as a means of settling disputes." 257 F.2d at 218, 219.

We adhere to the rule of our *Benedict Coal* case, and that of the dissent in *International Union, supra,* and believe these decisions fit the case before us. We consider that this holding is consonant with the Supreme Court's emphasis in United Steel Workers v. Warrior & Gulf Navigation Co., 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960), and Local 174, Teamsters, Chauffeurs, Warehousemen & Helpers of America v. Lucas Flour Co., 369 U.S. 95, 82 S.Ct. 571, 7 L.Ed.2d 593 (1962), of the high good of substituting employment of grievance procedures and arbitration for the warfare of strikes.

The contract provided for settlement of disputes, making clear that it is not necessary that this Court speculate or

make a finding as to the objective of abrogating the earlier "no strike" clause and the elimination of the word "exclusively". Nothing herein is intended to hold that the bargaining contract should be read as imposing liability upon UMW for spontaneous or wildcat strikes in which it had no part by way of causing or prolonging such strikes. The District Judge told the jury:

> "This suit is against the United Mine Workers of America. The local union is not a party to the contract, nor is it being sued in this action. Defendant United Mine Workers of America would not be liable for the action of the officers or individual members of the local union unless it is shown the United Mine Workers of America authorized, participated in, or ratified the acts of the local union or individual members after express knowledge of such acts, which are claimed to be violations of the contract."

## 2. Responsibility of UMW for work stoppages.

At all times here pertinent, Blue Diamond was a corporation engaged in coal mining in Perry County, Kentucky. It there operated two mines, Leatherwood No. 1 and Leatherwood No. 2. Blue Diamond's complaint charged that work stoppages or strikes, for which the international union was responsible, closed its mining operations for a total of 27½ days. One count of the complaint charged that UMW had coercively required plaintiff to enter into the National Bituminous Coal Wage Agreement, and thereafter discriminated against plaintiff by enforcing its contract against it but allowing its competitors, signatories to the same contract, to ignore the contract terms; and also caused slow downs by plaintiff's employees. As to these contentions, the District Judge granted the UMW motion for summary judgment. No appeal has been taken from such ruling.

The International Union of the United Mine Workers of America was the bargaining representative of the employees of Blue Diamond. Blue Diamond was a signatory of the National Bituminous Coal Wage Agreement of 1950, as amended in 1958. There was also a Local Union of the employees of Blue Diamond with its own officers and committee, but it was not a signatory to the above contract. The International Union is divided into geographic districts and the Blue Diamond mines were located in District 30. The officers of this District 30 are appointed by the International Union which also controls the policies which govern the relations between the mine owners and their employees. In 1962 and 1963, C. E. Beane was President of District 30 and a member of UMW's International Board; Bill Perkins was a representative of the International assigned to District 30, working under Beane; Squire Feltner was a field representative of the International for District 30. Officers of Local No. 8280 and its Mine Committee were elected by members of the local union employed at Leatherwood No. 1. All UMW members are subject to the "supreme authority" of the International and its Executive Board, which has the power to revoke the charter and penalize members for engaging in unauthorized work stoppages. The differences in United Mine Workers' control and responsibility for district representatives, as opposed to local unions and their members and officers, is recognized and not subject to dispute.

The evidence showed that for some five years prior to February, 1962, there had been but one work stoppage by Blue Diamond employees at Leatherwood No. 1. That occurred in 1959 when its employees joined other miners for two days in picketing non-union mines. Contrasted with this experience, commencing in February, 1962, and continuing into January, 1963, Blue Diamond was harassed by work stoppages in the commencement and continuance of which the officers of the International allegedly played such a part as amounted to breaches of the union's contract with Blue Diamond. If

such was proven, Blue Diamond was entitled to recover for such violations under § 301 of the Labor Management Relations Act of 1947, 29 U.S.C. § 185.

Plaintiff contended that statements by Bill Perkins and Beane evidenced the reasons for the commencement and continuance of the period of harassment. While witnesses for the Union (which term shall refer here to the International Union of the UMW, unless otherwise indicated) denied much of the testimony of plaintiff's witnesses, the jury was at liberty to find the following facts.

Across the hollow from Leatherwood mine No. 2 was a mine owned by Blair Fork Coal Company, a subsidiary of Blue Diamond. On February 5, 1962, the UMW filed with the National Labor Relations Board a charge, signed by Bill Perkins, asserting that Blair Fork Coal Company was encouraging its employees to join the Southern Labor Union, a rival of UMW. On February 28, 1962, Beane, District President of UMW, talking to the man in charge of Blue Diamond's labor relations, said that he, Beane, wished to cooperate with Blue Diamond, but if he ever found out that Blue Diamond was involved in the Blair Fork Coal Company mine, he did not know whether or not there was going to be any further cooperation between the Union and Blue Diamond.

Another witness for the company who heard Beane's statements of February 28, 1962, gave this recital of them:

"He stated that there had been cooperation between the U.M.W. and Blue Diamond Coal Company, but he had heard rumors to the extent that Blue Diamond Coal Company had acquired some adjacent property, Blair Fork by name; and that they were attempting to run it as a scab mine or something of that nature. He said he was checking into this and if he found out that it was so that all cooperation would cease, and he stressed again that he was looking into it and intended to find out."

Plaintiff argues that it would be fair to infer from the foregoing that the UMW representatives did find out about Blue Diamond's interest in Blair Fork and that UMW's subsequent conduct was fulfillment of UMW's threat "that all cooperation [with Blue Diamond] would cease."

Thereafter, on May 21, 1962, one John Slyger, a loading operator at Blue Diamond's Leatherwood No. 1 mine, refused to operate a loader without a helper and was discharged. A general strike at Leatherwood No. 1 followed on May 22 and 23. Thereafter, the men returned to work and the initial steps of the grievance procedure were taken to resolve the validity of Slyger's discharge. On May 28, representatives of the union and the company met as the third step of the procedure. Perkins, representative of the International for District 30, came to the meeting accompanied by the local union's mine committee and its President. Upon his arrival, Perkins said to the company representatives, "I can save a whole lot of time if you will answer one question for me * * *. Are you going to put him [Slyger] back to work?" Upon receiving a negative reply, Perkins, with the mine committee and President, left witout further discussion. A general strike followed the next morning, May 29, and continued through five days, ending on June 4.

On August 20, 1962, Perkins was again present at a meeting which included representatives of the local union, as well as the company representatives. There was a discussion relative to shift seniority. Perkins was described as being in an angry mood, and asked the company people, "Where is your chain?" This question was apparently prompted by the fact that at a mine known as the Scotia Coal Company mine, owned by Blue Diamond, Perkins was frustrated in his efforts to organize the miners there employed by a chain across the mine's entrance. The personnel director of Blue Diamond gave this account of the additional remarks of Perkins:

"I didn't say anything and we went on in the meeting and he kept talking and he said that in the past he had

instructed the Committee and the men there to cooperate with us and to work overtime when we needed it, but since we wouldn't let him go in on the property over at our Scotia Coal Company mine above Cumberland to organize the men that he was instructing the Committee right then and there in front of us that there wouldn't be no more overtime work and there would be no more cooperation and he said, 'It looks like it is going to be a fight to the finish, and we are going to go down fighting.' And Mr. Sheets asked him if not working overtime wasn't against the contract, and he said, 'To hell with the contract.' "

Another company representative told it this way:

"He [Perkins] was real angry and he asked us as we went into the office, 'Where in the H—— the chains were' and I didn't know what he was talking about and he said all he had been able to do for some time was to get chains and guards; that he had been to this property that we owned and had tried to get in on this property and organize the men there and talk to them, and he said he hadn't even had a chance to get on the property to talk to them and he was extremely angry about it. He said if that was the attitude that the Company was going to use, that he wanted us to know there and then that there would be no more cooperation from the U.M.W. He said at one time that he had instructed the tipple especially to work overtime in order to help us out and asked the men to work overtime to help us out; but he said, 'I want you to know that has ended,' and he instructed the Mine Committee and the Local officers that were there in my presence and told them—he said, 'From now on, there will be more (sic) overtime work at this mine. I want that understood.' And he turned to me and said, 'If you fire one of these men for this,' he said, 'We will strike.' And I asked him, I said, 'Mr. Perkins, isn't this against the contract?' And he said, 'To hell with the contract,' and

with that the meeting was terminated."

Following the August 20 meeting, just described, there was a one-half day work stoppage on August 24, 1962. No grievance had been filed in advance of this stoppage. While plaintiff argues that this was a way of emphasizing Perkins' "to hell with the contract" statement of August 20, we feel this one-half day work stoppage cannot be charged to defendant.

On October 1, 1962, there was another work stoppage for a single day, apparently because of work performed by a foreman. While there was no grievance procedure invoked, there is no evidence upon which responsibility for it could be placed on the International.

Beginning on December 3, 1962, there was another strike lasting five days. Following this, there was a work stoppage beginning January 8, 1963, which lasted through fourteen working days. These work stoppages were allegedly the result of the workers at Blue Diamond's Leatherwood No. 1 mine refusing to cross picket lines thrown about that mine by so-called roving pickets, miners who had been employed at Blue Diamond's Leatherwood mine No. 2. This activity followed Blue Diamond's cancellation of its contract with UMW covering its employees at Leatherwood mine No. 2. There was evidence that to resist Blue Diamond's cancellation of the contract at Leatherwood No. 2, employees there would come over and picket Leatherwood No. 1, whose men would not cross the picket line thrown up by Leatherwood No. 2 miners. The No. 1 miners would then go over and picket mine No. 2. There was evidence that during this activity Perkins, very much in evidence, was talking to the pickets and otherwise participating in what was going on. He testified that he attempted to get the employees of No. 1 to go back to work. However, there was evidence by former members of the UMW who had taken part in these strikes that Perkins would say to the strikers, "My job is to tell you fellows to go back to work," but this

would be coupled with the further advice that, "You could read between the lines." A variation of this was that they—the strikers—"ought to know what to do." Miners giving this testimony emphasized that the statements of Perkins were understood as suggestions that the miners should continue their strike or at least that Perkins would go along with it. One witness put it this way when asked the meaning of Perkins' "you know what to do." "Meant I didn't work, stayed on strike." The defendant UMW was aware of these December 1962 and January 1963 work stoppages, and there was evidence that the head office in Washington was directing Perkins and others to have the men go back to work. We are satisfied that the total evidence was sufficient to cast responsibility for the December 1962 and January 1963 strikes upon defendant.

Plaintiff claimed that it was entitled to damages for 27½ days that its mine was down due to illegal work stoppage. We, however, are of the opinion that as to the two-day stoppage on May 22 and May 23, 1962, the one-half day stoppage on August 24, 1962, and the one-day stoppage on October 1, 1962, there was not sufficient evidence from which a jury could find that they were otherwise than spontaneous stoppages, not chargeable to the International UMW. As to the remaining 24 days, we are satisfied that there was evidence from which the jury could affix responsibility therefor upon the defendant UMW. No citation of authority is necessary to support the rule we follow here, viz: that in testing the sufficiency of evidence to warrant submission of factual issues to a jury, the evidence and the legitimate inferences to be drawn therefrom must be viewed in the light most favorable to the party seeking the jury's verdict. In a case brought under the Federal Employers' Liability Act, the Supreme Court in Lavender v. Kurn, 327 U.S. 645, 66 S.Ct. 740, 90 L.Ed. 916 (1946), discussed the rule as follows:

"It is no answer to say that the jury's verdict involved speculation and con-jecture. Whenever facts are in dispute or the evidence is such that fair-minded men may draw different inferences, a measure of speculation and conjecture is required on the part of those whose duty it is to settle the dispute by choosing what seems to them to be the most reasonable inference. Only when there is a complete absence of probative facts to support the conclusion reached does a reversible error appear. But where, as here, there is an evidentiary basis for the jury's verdict, the jury is free to discard or disbelieve whatever facts are inconsistent with its conclusion. And the appellate court's function is exhausted when that evidentiary basis becomes apparent, it being immaterial that the court might draw a contrary inference or feel that another conclusion is more reasonable." 327 U.S. at 653, 66 S.Ct. at 744.

The Supreme Court there was dealing with a suit under the FELA whereas the suit here is brought upon another federal statute—Section 301 of the Labor Management Relations Act. We are aware of the liberality applied in testing the sufficiency of plaintiff's evidence in FELA cases, but we also took occasion to employ the above language of the Supreme Court in testing the sufficiency of a plaintiff's evidence in a diversity case not involving the FELA. See Lones v. Detroit, Toledo & Ironton R. R., 398 F. 2d 914, 919 (6th Cir. 1968). In Smith v. Illinois Central R. R., 394 F.2d 254 (6th Cir. 1968), we said:

"These issues all present questions of fact which must be determined by the jury, if they are supported by evidence. In determining a motion for a directed verdict in favor of one of the parties, the court must consider the evidence in the light most favorable to the party against whom the motion is made and must take into account any reasonable inferences that may be drawn from the facts in evidence. Smith v. Sloan, 189 Tenn. 368, 225 S. W.2d 539, 227 S.W.2d 2; Minton v. Southern Railway Company, 368 F.2d

719 (C.A.6); Wallace v. Louisville and Nashville Railroad Company, 332 F.2d 97 (C.A.6)." 394 F.2d at 256.

There is evidence that beginning in May, 1962, the UMW promised Blue Diamond a "bad time" in its relations with UMW. The May predictions and even stronger promises of antagonism such as "to hell with the contract" and like truculent expressions would be persuasive to any factfinder that Perkins was a party to, or the author of, the work stoppages involved. Perkins' activity around the picket lines during the December and January strikes and the language he employed in allegedly urging the men back to work provide a legitimate basis for the jury to conclude that he and, through him, others knew what was going on and were parties to the violation of the contract between Blue Diamond and UMW. An intelligent jury could listen *cum grano salis* to the UMW protestations of its impotence to control the miners who were subject to its authority.

In Lewis v. Benedict Coal Corp., 259 F.2d 346, *supra*, Justice Stewart, writing for this Court, held that the evidence in that case was sufficient to permit the jury to award damages resulting from some eight of eleven work stoppages. He said:

"The second basic contention of the International Union and District 28 is that even if the agreement prohibited strikes with respect to local disputes, the strikes in question were not authorized or ratified by the International Union or District 28. It is clear from the record that the district judge was not in error in instructing the jury that District 28 and its agents were agents of the International Union with respect to the activities involved here. *The real issue is whether the District's agent did induce the strikes in question. The evidence on this issue was sparse and conflicting, but was sufficient to sustain the jury's finding.* Scott, a former employee of Benedict and a member of the local mine committee, testified that prior to the first strike and several times

thereafter he was told by Scroggs, a field representative of District 28, "*I can't tell you boys when to strike. I can't tell you to strike, but when I tell you when you don't get what you want why you boys know what to do.*" Scott was then permitted to testify as to his understanding of Scroggs' statement. Scroggs unequivocally denied having made this statement. By their finding the jury chose to believe Scott rather than Scroggs. This was their prerogative." (Emphasis supplied.) 259 F. 2d at 351–352.

We hold that the evidence was sufficient to permit the jury to award damages for the several work stoppages, except those which occurred on May 22 and 23, 1962, August 24, 1962, and October 1, 1962.

### 3. Computation of Damages.

To establish its losses from the several strikes, Blue Diamond offered the testimony of its Vice-President and Secretary who computed the damages suffered as a consequence of the several work stoppages. Using the company's own records, his method is set out in appellee's brief to this Court as follows:

"Blue Diamond started by determining, as best it could, the amount of tonnage lost by these strikes. To do this, it divided the total number of tons of coal actually produced each month by the number of actual operating days in that same month, thereby giving a reasonably accurate average per-day production figure. It then multiplied this daily production figure by the number of strike days, thereby ascertaining the number of tons lost by the strike. To convert this figure into a dollar amount, it took the average selling price of coal, per ton, during that month, and multiplied it by the amount of tons lost. This furnished, with the greatest amount of accuracy possible, the actual loss of revenue in dollars which were attributable to the strike. Next, the com-

pany showed its actual realization (total receipts from total sales) during the month, and its actual cost of production during the same month. The difference between these figures revealed the actual loss or profit to the company during that month. Next, it projected what its total receipts would have been by adding actual receipts to the dollar figure which had been determined for tons lost by the strike. This gave a projected or anticipated total realization for the month, had there been no strike. It then projected, upon the basis of experience and knowledge, the added cost of production had the added tons been produced, and this estimate was broken down in the most logical way possible. It then added to its actual production cost the additional cost of production estimated for the lost tonnage, which would give a projected or anticipated total production costs for all the coal, both that which was mined and that which was lost. The comparison of these figures, like the actual experience, would then reveal what the total profit or loss would have been had there been no strike. In the course of pointing out this form of computation, it was also explained that the cost of production of coal per ton diminished as the production increased—this due to the fact that there were substantial fixed costs, regardless of the amount of production, and that these fixed costs diminished per ton as the number of tons increased."

The method thus employed was reviewed by a Certified Public Accountant employed by the firm of Ernst & Ernst. He supported the validity of the method used and the results thereof. The appellant UMW produced a C.P.A. who employed his own method of computing plaintiff's damages, coming up with a tr al figure grossly below that of Blue Diamond's witness. On cross-examination, however, he agreed that his own methods could be wrong, and those used by Blue Diamond correct. It was for the jury to determine the correctness of the competing methods employed. Plaintiff's testimony in such regard was sufficient to allow them to do so. In Riverside Coal Co. v. United Mine Workers of America, 410 F.2d 267 (6th Cir. 1969), we said:

> "The questions raised concerning damages are essentially questions of fact, and at least with regard to the alleged damages resulting from lost profits, the law is clear and not disputed. As stated in United Mine Workers v. Osborne Mining Co., *supra*, 279 F.2d [716] at 727:
>
> > 'Profits are recoverable where there is an established business and they can be proven with reasonable certainty.'
>
> Lost profits are not recoverable when based upon 'sheer speculation and guesswork' Mitchell Coal Co. v. UMW, 313 F.2d 78, 79 (6th Cir. 1963).
>
> "It has long been recognized that once the fact of damage has been properly shown, 'uncertainty as to their amount will not foreclose recovery.' Flame Coal Co. v. UMW, 303 F.2d 39, 44 (6th Cir. 1962) cert. denied, 371 U.S. 891, 83 S.Ct. 186, 9 L.Ed.2d 125; Story Parchment Co. v. Paterson Parchment Paper Co., 282 U.S. 555, 562–563, 51 S.Ct. 248, 75 L.Ed. 544 (1931); Hi Hat Elkhorn Coal Co. v. Inland Steel Co., 370 F.2d 117, 118 (6th Cir. 1966)." 410 F.2d at 274.

The damages estimated by plaintiff's witnesses totalled $281,990.57; such was the amount of the jury's verdict. Except as to the several work stoppages which we hold cannot be charged to the UMW, the jury's verdict was not excessive.

**4. The Court's instructions.**

**a) General.**

Appellee proffered an instruction whereby the jury would be told that an award of damages could not be "based upon guess," that plaintiff could not "recover remote, uncertain, or speculative damages" and that damages had to be proved "by the preponderance of the

evidence with reasonable certainty." Our own review of plaintiff's proofs of damages discloses that they provided a method for computing them without resort to guess, speculation or substantial uncertainty. The District Judge told the jury that if they found that defendant UMW had breached its contract,

> "you should find for the plaintiff, awarding it such damages, if any, as you shall believe from the evidence were suffered by plaintiff as a direct result of the defendant's breach of the contract as above conditioned and described; but unless you so believe the defendant Union breached its contract, you should find for the defendant. * * *

> "If under these instructions the Jury believes plaintiff is entitled to recover from the defendant on plaintiff's claim for loss of production by reason of the strikes referred to in the evidence, then you will award plaintiff such a sum in damages as you may find from the evidence will fairly and reasonably compensate plaintiff for the loss of profits it is reasonably certain it would have made in its coal mining operation but for the occurrence of said strikes."

We consider that the jury was correctly instructed on the matter of damages. Proffered, but refused, instructions to the jury that the UMW would not be responsible for spontaneous or wildcat strikes, were adequately covered by the District Judge's instruction that,

> "This suit is against the United Mine Workers of America. The local union is not a party to the contract, nor is it being sued in this action. Defendant United Mine Workers of America would not be liable for the action of the officers or individual members of the local union unless it is shown the United Mine Workers of America authorized, participated in, or ratified the acts of the local union or individual members after express knowledge of such acts, which are claimed to be violations of the contract."

### b) Instructions on burden of proof.

Special criticism is directed at the District Judge's failure to tell the jury that the burden was on the plaintiff to prove its case *by a preponderance of the evidence*. In refusing to do so, the District Judge chose to follow a relevant Kentucky rule. It is the rule in Kentucky that instructions to a jury should not include such an instruction. Ragsdale v. Ezell, 99 Ky. 236, 239, 35 S.W. 629, 1130 (1896); Macon v. Paducah St. Ry. Co., 110 Ky. 680, 689, 62 S.W. 496 (1901); Mills v. Louisville & N. R. R. Co., 116 Ky. 309, 316, 76 S.W. 29 (1903); Gorman v. Berry, 289 Ky. 88, 91, 158 S.W.2d 155 (1942). In *Ragsdale, supra,* the Court gave, in part, the reason for its special rule in this regard—"The word preponderance should be omitted from such instructions, *as it is only calculated to embarrass the jury when considering the issue.*" 99 Ky. at 239, 35 S.W. at 630. The Court in *Ragsdale* further said of the Kentucky rule,

> "[W]hen a trial court undertakes to place the right of recovery upon the preponderance of testimony in favor of the plaintiffs or those holding the affirmative of the issue, it often becomes necessary to explain what is meant by the preponderance of proof, and in doing so a jury is often misled by the trial court. On an issue of fact the party holding the affirmative or making the charge must make out his case, and when testimony is introduced on both sides as in this case the jury should be told: 'If they believe from the evidence the defendant Ragsdale, assaulted the plaintiff as charged in the petition the plaintiff is entitled to recover * * * '." 99 Ky. at 238, 35 S.W. at 630.

In *Macon, supra,* the Kentucky Court said:

> "The jury were told in No. 2 that the burden is upon the plaintiff to prove negligence. This court has often condemned instructions stating upon whom the burden of proof rested, or similar expressions." 110 Ky. at 689, 62 S.W. at 498.

In *Mills, supra,* the Court said:

" * * * the court should not instruct the jury upon burden of proof, but simply so frame the instructions as to indicate on whom the burden of proof lies." 116 Ky. at 316, 76 S.W. at 31.

Rule 43.01 of Kentucky's Rules of Civil Procedure provides:

"(1) The party holding the affirmative of an issue must produce the evidence to prove it. ·

"(2) The burden of proof in the whole action lies on the party who would be defeated if no evidence were given on either side."

In lieu of the requested instructions, and following the Kentucky rule, the jury was charged variously, "If breach of the contract has been established by the evidence * * *," and "If you believe from the evidence," and like expressions.

Appellant argues that the action here is the creature of Congressional enactment and that § 301 of the LMRA does not merely confer jurisdiction upon the United States Courts to hear suits for violation of bargaining agreements, but that federal law, substantive as well as procedural, controls. In Textile Workers Union v. Lincoln Mills, 353 U.S. 448, 77 S.Ct. 912, 1 L.Ed.2d 972 (1957), dealing with a suit under § 301 for specific performance of an arbitration clause of a collective bargaining contract, it was said:

"The question then is, what is the substantive law to be applied in suits under § 301(a)? We conclude that the substantive law to apply in suits under § 301(a) is federal law which the courts must fashion from the policy of our national labor laws." 353 U.S. at 456, 77 S.Ct. at 918.

The above pronouncement did not relate to the style of instructions to a jury. Neither the Supreme Court nor any of the Circuits have as yet fashioned a relevant controlling rule. We read appellant's claim, however, to be that if we are now to fashion a relevant rule, "the policy of our national labor laws" commands that such rule must require that in an issue arising under § 301, the jury must be told that *the burden of proof is upon a plaintiff to prove the elements of its case by a preponderance of the evidence.* This is so, the argument proceeds, because we should consider that the foregoing is the better rule. It may be conceded that where the burden of proof lies is a matter of substantive law, Central Vermont Ry. v. White, 238 U.S. 507, 35 S.Ct. 865, 59 L.Ed. 1433 (1915). This, however, is not to say how a jury shall be instructed. Nothing in *Lincoln Mills* or *Central Vermont, supra,* would forbid us in our job of fashioning a rule to control the style of a relevant jury instruction, from employing the rule of the state in which a cause is tried. That such is permissible is confirmed by Mr. Justice Douglas' language in *Lincoln Mills.*

"But state law, if compatible with the purpose of § 301, may be resorted to in order to find the rule that will best effectuate the federal policy." 353 U.S. 457, 77 S.Ct. 918.

And that was what was done in Board of Commissioners of Jackson County v. United States, 308 U.S. 343, 351, 352, 60 S.Ct. 285, 84 L.Ed. 313 (1939). It has been held that where a cause of action is created by an Act of Congress without such Act containing a statute of limitations, the federal courts will apply the limitations statute of the forum state. Cope v. Andersen, 331 U.S. 461, 463, 67 S.Ct. 1340, 91 L.Ed. 1602 (1947); International Union, United Auto, Aerospace and Agr. Implement Workers, etc. v. Hoosier Cardinal Corp., 383 U.S. 696, 704, 86 S.Ct. 1107, 16 L.Ed.2d 192 (1966); Englander Motors, Inc. v. Ford Motor Company, 293 F.2d 802, 804 (6th Cir. 1961). Similarly, the federal courts are instructed by Rule 43(a) of the Fed. R.Civ.P. that regardless of the applicable federal statutory or court made rule, they are to apply the comparable state evidentiary rule if it is more favorable to the reception of evidence. This is true for federally created causes of action as well as in diversity cases.

While the case before him did not involve a cause of action created by an Act of Congress, our late colleague, Judge Shackelford Miller, Jr., then a District Judge, in Mutual Life Ins. Co. v. Green, 37 F.Supp. 949 (W.D.Ky.1941), employed language helpful to us here. Before him was a diversity suit upon an insurance policy. Instructions which he had given to a jury under the Kentucky rule were charged as erroneous upon a motion for new trial. It was contended that notwithstanding Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, an instruction referring to the preponderance of evidence rule was an essential element of trial by jury in the federal courts, as guaranteed by the Seventh Amendment to the Constitution. In denying the motion, Judge Miller said:

"It is contended, however, that the preponderance rule is an essential element of the trial by jury in the Federal Courts which right is reserved to all litigants in the Federal Courts by the Seventh Amendment to the United States Constitution. We do not agree with that contention. * * *

"Since the requested instruction is not required by the United States Constitution, or by any act of Congress, we believe that the instruction which followed the state practice was the proper one under the ruling announced by Erie Railroad Co. v. Tompkins, *supra*." 37 F.Supp. at 954.

It is not essential that we undertake a comparative study of the relevant Kentucky form of instruction with that more generally in use, and make a judicial choice of the one we prefer. While the Kentucky opinions provide but meager elucidation of its rule, it can be argued that telling a jury, "If you believe from the evidence" may actually require a greater burden of proof than "by a preponderance of the evidence." We call to mind the varying expressions employed by trial judges to tell juries the meaning of preponderance of the evidence, and do understand Kentucky's view that these efforts may indeed make a jury's task more difficult than Kentucky's "if you believe." We hold, therefore, that by using Kentucky's rule the District Judge did not offend any special and relevant federal common law of procedure.

Without derogating the entitlement of all litigants to have a case submitted to a jury in conformity with law, we are of the view that the difference between Kentucky's rule and the more conventional style of instruction is not such that the use of the Kentucky style in this case denied appellant any "substantial right." 28 U.S.C. § 2111 and Rule 61, F.R.Civ.P.

We have considered appellant's other criticisms of the court's charge and claims of error and find them without merit.

Using the method employed by plaintiff to prove its losses, we have concluded that such part of the jury's total award which was allowable to the 3½ days for which we are not allowing recovery amounted to $34,095.79. Accordingly, the judgment for plaintiff is reduced to the sum of $247,894.78 and, so reduced, is hereby affirmed.

McCREE, Circuit Judge, with whom CELEBREZZE, Circuit Judge, joins, concurring in the result.

The United States Supreme Court has made it clear that "the subject matter of § 301(a) 'is peculiarly one that calls for uniform law'" [citations omitted]. Teamsters Local 174, Chauffeurs, Warehousemen & Helpers of America v. Lucas Flour Co., 369 U.S. 95, 103, 82 S.Ct. 571, 576, 7 L.Ed.2d 593 (1962). It is also clear that the burden of proof may affect the substantive rights of the parties, and in cases determining rights created by federal statute, the applicable rule is to be determined by reference to federal law. *See* Central Vermont Railway Company v. White, 238 U.S. 507, 510–512 (1915); cf. Garrett v. Moore-McCormack Co., Inc., et al., 317 U.S. 239, 248–249, 63 S.Ct. 246, 87 L.Ed. 239 (1942); Hill, et al. v. Smith, 260 U.S. 592, 594, 43 S.Ct. 219, 67 L.Ed. 419 (1923). Of course diversity cases are

not apposite here because we are concerned with a federal cause of action. Nevertheless, I believe the requirement that federal courts apply, in diversity cases, the burden of proof of the state in which they sit supports my conclusion that burden of proof is outcome determinative. See IA J. Moore Federal Practice ¶ 0.314[2], at 3506 (2d ed. 1965); 5 id. ¶ 43.08, at 1360–61. I am not persuaded otherwise by the fact that state statutes of limitation are applicable in suit under § 301 since

> [i]t is clear that Congress gave attention to limitations problems in the Labor Management Relations Act, 1947; it enacted a six months' provision to govern unfair labor practice proceedings, 61 Stat. 146, 29 U.S.C. § 160(b) (1964 ed.), and it did so only after appreciable controversy. In this context, and against the background of the relationship between Congress and the courts on the question of limitations provisions, it cannot be fairly inferred that when Congress left § 301 without a uniform time limitation, it did so in the expectation that the courts would invent one.

International Union, United Automobile, Aerospace and Agricultural Implement Workers of America (UAW), AFL–CIO v. Hossier Cardinal Corp., 383 U.S. 696, at 703, 86 S.Ct. 1107, at 1112 (1966).

I would hold that federal district courts must uniformly instruct the jury to decide in accordance with the preponderance of the evidence. To hold otherwise might encourage state courts to attempt to vindicate important federal rights, created by the Congress, in disparate fashion by applying local law.

In this case, however, I am convinced that the court below did not prejudice appellant by using the Kentucky burden of proof jury instructions. The requirement that the jurors "believe from the evidence" in effect requires that they be persuaded by the weight of the evidence. Accordingly, I concur in the decision to affirm.