CF&I STEEL CORPORATION, a Colorado corporation, Plaintiff,

v.

UNITED MINE WORKERS OF AMERICA, an unincorporated association, Individually and as representative of its members employed by plaintiff, et al., Defendants.

Civ. A. No. C–5083.

United States District Court,
D. Colorado.

Nov. 12, 1973.

Welborn, Dufford, Cook, Phipps & Brown, by Thomas G. Brown, Denver, Colo., for plaintiff.

Edward J. Scheunemann, Denver, Colo., for defendants.

## MEMORANDUM OPINION AND ORDER

ARRAJ, Chief Judge.

This action was brought pursuant to § 301 of the Labor Management Relations Act of 1947, 29 U.S.C. § 185(a) (1970), by plaintiff CF&I Steel Corporation, seeking a broad injunction to prevent future violations of an alleged no-strike obligation in a labor contract. The plaintiff is a Colorado corporation engaged in the production of steel at Minnequa, Colorado. To supply the coal requirements of the Minnequa mill, plaintiff owns and operates a bituminous coal mine at Weston, Colorado, known as the Allen Mine. Employed at the Allen Mine are approximately 500 miners, nearly 450 of whom are members of the United Mine Workers of America. The miners are engaged in an industry affecting commerce, as defined in the Labor Management Relations Act.

Named as defendants are the United Mine Workers of America, the District 15 representative on the Executive Board of the United Mine Workers of America, the Acting President of District 15 and the President of Local Union 9856 of the United Mine Workers of America, the three members of the Mine Committee at the Allen Mine, and all the miners at the Allen Mine who are members of the United Mine Workers of America.

This lawsuit is the culmination of a series of labor-management difficulties at the Allen Mine, the latest of which was a forty-hour strike that began on June 11, 1973. On that occasion the plaintiff applied to this court for a temporary restraining order to halt the strike. Because we were persuaded at that time by the plaintiff's argument that the strike was in violation of the employment contract in force between the plaintiff and the defendants, and because the plaintiff presented a convincing case for equitable relief, we issued a temporary restraining order to end the strike, and an order to show cause why a preliminary injunction should not be issued in accordance with the prayer of the complaint. On oral stipulation and pursuant to Rule 65(a), F.R.Civ.P., counsel have agreed that the hearing on the application for preliminary injunction, including memoranda filed and subsequent oral argument, is to be treated as the trial of the action on the merits, insofar as it relates to the petition for injunctive relief.

The present controversy centers around Article XVII, Section (b), of the National Bituminous Coal Wage Agreement of 1971, between the Bituminous Coal Operators' Association, of which the plaintiff is a member, and the United Mine Workers. Article XVII, Section (b), of the Agreement, reproduced in a footnote,[1] establishes a Grievance

---

1. Article XVII—SETTLEMENT OF DISPUTES

\* \* \* \* \*

Section (b) Grievance Procedure

\* \* \* \* \*

[Grievances shall be settled:]

(1) By the aggrieved party and his foreman who shall have authority to settle the complaint. Any grievance which is not filed by the aggrieved party within fifteen calendar days after he reasonably should have known of such grievance shall be considered invalid and not subject to further prosecution under the grievance machinery.

(2) If no agreement is reached, the grievance shall be taken up by the mine commit-

Procedure for the settlement of disputes that arise between employers and employees subject to the agreement. The Grievance Procedure consists of five successive levels of negotiation between the parties to the grievance dispute. The final level is compulsory, binding arbitration. Grievances which are required to be resolved through the contractually established procedure are described by the following paragraph of the National Agreement:

Should differences arise between the Mine Workers and the Employer as to the meaning and application of the provisions of this agreement, or should differences arise about matters not specifically mentioned in this agreement, or should any local trouble of any kind arise at the mine, an earnest effort shall be made to settle such differences at the earliest practicable time [in the manner established by the Grievance Procedure].

(Article XVII)

The Grievance Procedure of the previous contract, The National Bituminous Coal Wage Agreement of 1968, did not differ significantly from that of the 1971 Agreement. A final pertinent provision of the 1971 Agreement, virtually identical to one found in the 1968 Agreement, is the following:

The United Mine Workers of America and the Employers agree and affirm that they will maintain the integrity of this contract and that all disputes and claims which are not settled by agreement shall be settled by the machinery provided in the "Settlement of Disputes" article of this agreement unless national in character in which event the parties shall settle such disputes by free collective bargaining as heretofore practiced in the industry, it being the purpose of this provision to provide for the settlement of all such disputes and claims through the machinery in this contract and by collective bargaining without recourse to the courts.

(Article XX)

The plaintiff argues that the June 11, 1973, strike and seven previous strikes were violations of Articles XVII and XX of the 1971 Agreement or of the comparable provisions of the 1968 Agreement and asks this court to enjoin future such violations during the remaining life of the 1971 Agreement, which is not subject to termination prior to November 12, 1974.

Whether an anti-strike injunction should issue here depends upon the interpretation to be given the anti-injunction provisions of the Norris-LaGuardia Act and the exception to that Act created by Boys Markets v. Clerks Union, 398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970).

The Norris-LaGuardia Act provides, in pertinent part, as follows:

No court of the United States shall have jurisdiction to issue any re-

tee and the mine management within five calendar days of the conclusion of step 1. A standard grievance form shall be completed and jointly signed by the parties to the grievance. Such a form will be agreed upon by the parties.

(3) If no agreement is reached, the grievance shall be taken up by the UMW district representative and a designated representative of the Employer within ten calendar days of the conclusion of step 2.

(4) If no agreement is reached, the grievance shall be taken up by the Board within ten calendar days of the conclusion of step 3 or in discharge cases within five calendar days of notice of appeal. The Board shall consist of four members, two of whom shall be designated by the Union and two by the Employer. Neither the Union's representatives on the Board nor the Employer's representatives on the Board shall be the same persons who participated in steps 1, 2, or 3 of this procedure.

(5) Should the Board fail to agree the matter shall, within ten calendar days after decision by the Board, be referred to an umpire who shall expeditiously and without delay decide said case. The decision of the umpire shall be final. Expenses and fees incident to the services of an umpire shall be paid equally by the Employer or Employers affected and by the Union.

(Article XVII, Section (b), National Bituminous Coal Wage Agreement of 1971)

straining order or temporary or permanent injunction in any case involving or growing out of any labor dispute to prohibit any person or persons participating or interested in such dispute (as these terms are herein defined) from doing, whether singly or in concert, any of the following acts:

(a) Ceasing or refusing to perform any work or to remain in any relation of employment. 29 U.S.C. § 104 (1970)

In Boys Markets v. Clerks Union, 398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed. 199 (1970), the Court held it proper, notwithstanding the Norris-LaGuardia Act, for a federal court to enjoin a strike found to be in violation of the compulsory arbitration provisions of a collective-bargaining agreement. The conditions under which such an injunction may issue were stated in the following manner:

When a strike is sought to be enjoined because it is over a grievance which both parties are contractually bound to arbitrate, the District Court may issue no injunctive order until it first holds [1] that the contract *does* have that effect; [2] and the employer should be ordered to arbitrate, as a condition of his obtaining an injunction against the strike. Beyond this, the District Court must, of course, consider whether issuance of an injunction would be warranted under ordinary principles of equity—[3] whether breaches are occurring and will continue, or have been threatened and will be committed; [4] whether they have caused or will cause irreparable injury to the employer; and [5] whether the employer will suffer more from the denial of an injunction than will the union from its issuance. 398 U.S. at 254, 90 S.Ct. at 1594 (emphasis in original) (numbering added).

■ Our first inquiry is whether the National Bituminous Coal Wage Agreement of 1971 does prohibit strikes over arbitrable issues. Unlike the collective-bargaining agreement involved in *Boys*

*Markets*, the present agreement does not contain an explicit no-strike provision. However, we agree with those cases that have found implied no-strike obligations in cases similar to the present one. Despite the absence from the 1971 Contract of an explicit prohibition against strikes over arbitrable issues, we find such an obligation implicit in those parts of the contract which require a broad range of disputes to be settled through the Article XVII Grievance Procedure, resulting in binding arbitration if necessary. A contrary conclusion would render illusory the agreements found in Articles XVII and XX of the 1971 Agreement. *See* Teamsters Local 174 v. Lucas Flour, 369 U.S. 95, 82 S.Ct. 571, 7 L.Ed.2d 593 (1962); Old Ben Coal Corporation v. Local Union No. 1487 of UMWA, 457 F. 2d 162 (7th Cir. 1972); Blue Diamond Coal Company v. UMWA, 436 F.2d 551 (6th Cir. 1970), cert. denied 402 U.S. 930, 91 S.Ct. 1525, 28 L.Ed.2d 863 (1971); Southwestern Illinois Coal Corporation v. Local Union No. 1392, UMWA, 70 L.C. ¶ 13,531 (E.D.Ill.1972). It necessarily follows that strikes over disputes required to be settled through the contractually established grievance procedure are violations of the contract.

Having decided that the 1971 Agreement does prohibit strikes over arbitrable issues, we come to the difficult part of this case, which is to decide whether the eight strikes upon which the plaintiff relies in its claim for injunctive relief have been over issues which fall within the scope of Article XVII, and which, therefore, should have been settled in the manner established by the Grievance Procedure.

A commentator quoted with approval in Steelworkers v. Warrior & Gulf Co., 363 U.S. 574, 579–580, 80 S.Ct. 1347, 1351, 4 L.Ed.2d 1409 (1960), has indicated why our decision concerning the scope of Article XVII of the 1971 Agreement is a difficult one:

There are too many people, too many problems, too many unforeseeable contingencies to make the words of the contract the exclusive source of rights

and duties. One cannot reduce all the rules governing a community like an industrial plant to fifteen or even fifty pages. Within the sphere of collective bargaining, the institutional characteristics and the governmental nature of the collective-bargaining process demand a common law of the shop which implements and furnishes the context of the agreement.

Cox, "Reflections Upon Labor Arbitration," 72 Harv.L.Rev. 1482, 1498–1499 (1959). It is because we are unfamiliar with the "common law of the shop," with possible written or oral local agreements at the Allen Mine, supplementing or modifying the National Agreement, and with industry practices and traditions, that we have some trouble deciding what disputes are required to be settled through the Grievance Procedure. Courts have responded to this difficulty in a variety of ways. In Standard Food Products Corporation v. Brandenburg, 436 F.2d 964 (2d Cir. 1970), the Court of Appeals for the Second Circuit held that an anti-strike injunction would not issue where the union presented a "colorable claim" that the dispute over which the strike occurred was excluded from the arbitration requirements of the governing collective-bargaining agreement. 436 F.2d at 966. The opposite presumption was proposed in Southwestern Bell Telephone Company v. Communications Workers of America, 454 F.2d 1333 (5th Cir. 1971), where the court held that a strike over a dispute that was "arguably arbitrable" would be enjoined. 454 F.2d at 1336. A law review commentator has argued that neither of these presumptions is appropriate and that a court should

> take a more active role in determining arbitrability without applying any presumption one way or the other. A court should initially examine the prior practices in the particular enterprise and in its industry, the negotiations leading up to the collective agreement, and any oral understanding between the parties, to determine whether the parties have given con-

tent to the terms of the collective agreement so as to indicate clearly that a particular dispute falls within or without its provisions.

Note, "Labor Injunctions, Boys Markets and the Presumption of Arbitrability," 85 Harv.L.Rev. 636, 644 (1972).

Although much can be, and has been, said both for and against the various suggested solutions, this court does not consider itself entirely free to choose among them, and will not engage in an extended discussion of the alternatives. In Steelworkers v. Warrior & Gulf Co., 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960), the Supreme Court, having noted that "[t]he present federal policy is to promote industrial stabilization through the collective bargaining agreement[,]" and that "[a] major factor in achieving industrial peace is the inclusion of a provision for arbitration of grievances in the collective bargaining agreement[,]" 363 U.S. at 578, 80 S.Ct. at 1350, stated the following:

> In the absence of any express provision excluding a particular grievance from arbitration, we think only the most forceful evidence of a purpose to exclude the claim from arbitration can prevail, particularly where, as here, the exclusion clause is vague and the arbitration clause quite broad. Since any attempt by a court to infer such a purpose necessarily comprehends the merits, the court should view with suspicion an attempt to persuade it to become entangled in the construction of the substantive provisions of a labor agreement, even through the back door of interpreting the arbitration clause, when the alternative is to utilize the services of an arbitrator. 363 U.S. at 584–585, 80 S.Ct. at 1354.

Although *Warrior & Gulf* was decided before *Boys Markets*, and was a suit by a union to compel arbitration, rather than an employer's suit to stop a strike, we have concluded that the considerations that supported a strong presumption of arbitrability in *Warrior & Gulf* require a similar presumption here.

The reasons for the presumption in *Warrior & Gulf* were, basically, the importance attached by federal labor policy to the peaceful settlement of labor disputes and the desirability of settling such disputes through the informed judgment of experienced labor arbitrators. Because these considerations are equally relevant and important here, we conclude that where there is uncertainty concerning the scope of an arbitration clause in a collective-bargaining agreement, "[d]oubts should be resolved in favor of coverage." *Warrior & Gulf* at 583, 80 S.Ct. at 1353.

With this presumption of arbitrability in mind, we proceed to an examination of the evidence concerning the eight strikes at issue here, beginning with the most recent and proceeding, in reverse chronological order, to the most remote. At the outset we note that, like the *Warrior & Gulf* court, we are dealing with an extremely broad arbitration clause, which requires arbitration

> [s]hould differences arise . . . as to the meaning and application of the provisions of this agreement, or should differences arise about matters not specifically mentioned in this agreement, or should local trouble of any kind arise at the mine . . . [,]

and with an exclusion clause which exempts from arbitration only those disputes which are "national in character."

■ The dispute from which the June 11, 1973, strike arose involved a group of miners who left the mine before the end of their shift one day to attend the funeral of a fellow miner. The company took the position that these employees were entitled to wages for that day only up to the time when they left the "face," that is, the specific working area to which they were assigned within the mine. The employees claimed that they were entitled to "portal-to-portal" pay, that is, pay from the time they entered the mine to the time they left the mine. The parties attempted to settle the dispute through the Article XVII

Grievance Procedure; an impasse had been reached at level four of that procedure when the strike occurred. We have little trouble concluding that the strike was over an issue which should have been settled through the Grievance Procedure, either as a matter of "local trouble" or of contract interpretation. That the issue was actually carried through step four of the Grievance Procedure is a strong indication that both parties thought likewise. Indeed, in a deposition the Acting President of District 15 of the United Mine Workers explicitly stated that the portal-to-portal pay issue was subject to the grievance machinery in the contract. We find, consequently, that the June 11, 1973, strike was over an arbitrable grievance and was a violation of the 1971 Agreement.

The August 29, 1972, strike concerned the provisional discharge of two employees following the "oiling" or "greasing" of a miner, the miners' equivalent of tarring and feathering. Although it does appear that the employer may have followed an improper procedure in discharging the two employees, the impropriety, if there was any, did not relieve the employees of their obligation not to strike if the dispute was arbitrable. We find that it was. Discharge of employees for improper conduct during working hours is clearly "local trouble," and any disputes arising therefrom should be settled through the Grievance Procedure. Again, the parties did in fact resort to the Grievance Procedure in an attempt to settle the matter.

■ The preceding strike occurred November 17, 1971, five days after the 1971 Agreement became effective. It arose from dissatisfaction with some of the terms of the newly completed agreement and was one of a series of strikes which occurred throughout the country. Our conclusion from the evidence is that the issue was "national in character" and therefore not subject to arbitration.

The remaining five strikes occurred while the 1968 Agreement was in effect. As we have indicated above, the relevant provisions and consequent obligations of

that Agreement did not differ in any material respect from those of the present agreement.

■ On July 28, 1971, there occurred an eight-hour work stoppage as a gesture of sympathy for the family of a miner who had suffered a heart attack in the mine the previous week and had died in a hospital shortly afterwards. We find that no dispute, arbitrable or otherwise, was involved in this work stoppage. Although less than clear from the evidence, it appears that there is some sort of tradition among coal miners to take one shift off when a man dies in the mine. The employer appears to have taken, or at least to be taking now, the position that the miner on whose behalf work stopped on July 28, 1971, did not die in the mine, and therefore, that his death was not one justifying a shift off work, within the tradition. While disagreement over the terms of the tradition might have resulted in a subsequent arbitrable dispute— for example, discharge of an employee for missing work the day of the stoppage—the stoppage itself did not arise from or in any way involve an arbitrable dispute between employer and employees, and was not a violation of the grievance provisions of the contract.

The June 14, 1971, strike resulted from an altercation between a foreman and a miner who wanted to leave work earlier than the foreman wanted him to leave. The two argued, and the miner was subsequently suspended for three days for cursing a supervisor. Like the employee discharges over which the August 29, 1972, strike occurred, we find that the employee suspension involved in the June 14, 1971, strike was an issue which should have been settled through the Article XVII Grievance Procedure.

On January 12, 1971, the miners struck when a roof-bolter refused to operate a shuttle car and was warned that future such "violations" would result in his discharge. This work assignment issue clearly falls within the category "local trouble" and should have been resolved through the Grievance Procedure, without resort to a strike.

■ The strike on October 20, 1970, was an expression of the miners' dissatisfaction with medical services available at the mine. While the dispute was clearly "local trouble," the defendants argue that safety disputes are not subject to settlement through the Grievance Procedure, citing Gateway Coal Co. v. United Mine Workers, 466 F.2d 1157 (3d Cir. 1972), cert. granted 410 U.S. 954, 93 S.Ct. 1419, 35 L.Ed.2d 687 (1973). Assuming that Gateway Coal correctly concluded that miners may strike because of a good faith apprehension of physical danger, we find that the evidence fails to show such an apprehension in the present case. For several months prior to the strike the miners complained about medical service without finding it necessary to stay out of the mine to avoid physical danger. A stronger showing than was made here is necessary to overcome the presumption of arbitrability. Consequently, we find that the October 20, 1970, strike was over an arbitrable issue, in violation of the 1968 Agreement.

■ The final strike involved in this case began on May 14, 1969. The issue that precipitated the strike, like that involved in the January 12, 1971, strike, had to do with work assignments, an arbitrable local issue. However, three other issues—vacation pay, hoistmen's pay, and an employee discharge—immediately became involved. There is evidence in the record to the effect that there is a "policy in the industry" not to arbitrate questions of hours and wages; relying on this policy, the union apparently took the position that the vacation pay and hoistmen's pay issues were not arbitrable. Very little evidence was presented to show the precise contours of the "policy" or to show how it applied to the issues involved in the May, 1969, strike. As a result, we are left completely up in the air as to the arbitrability of the vacation pay and hoistmen's pay issues, and we must, in accordance with the presumption of arbitrability, resolve our

doubts in favor of arbitrability. Accordingly, we find the May 14, 1969, strike to have been over issues of contract interpretation and local trouble, and that the Grievance Procedure was the proper avenue of resolution.

▉▉ To summarize, we have found that six of the eight strikes have been in violation of the 1971 or the 1968 Agreement. The issue of employee discharge or suspension was involved in three of the six, and disputes having to do with work assignments were involved in two. The issues of portal-to-portal pay, medical services, vacation pay, and hoistmen's pay arose once apiece. Because we do not find that these latter four issues are likely to recur, we conclude that no case for equitable relief has been established as to them. However, we do find that additional strikes over employee suspensions, employee discharges, and work assignments are likely to occur unless prohibited by order of this court. The suggestion has been made that, the June 11, 1973, strike having ended, this action should be dismissed as moot. We decline to adopt the suggestion. The mere fact that the conduct to be enjoined has ceased temporarily is not a ground for the denial of injunctive relief where, as here, a showing has been made that it is likely to resume in the future. See United States v. W. T. Grant Co., 345 U.S. 629, 632–633, 73 S. Ct. 894, 97 L.Ed. 1303 (1953); United States Steel Corporation v. United Mine Workers of America, 66 L.C. ¶ 11,928 (E.D.Ky.1971).

We further find that the plaintiff is likely to suffer irreparable damage and injury unless future strikes are enjoined. Damage is likely to result from inadequate attention to roof-shoring and drainage needs at the Allen Mine and from adjustments that will be required at the Minnequa steel mill if the supply of coal from the Allen Mine is reduced. In addition, we find that the plaintiff will suffer more from the denial of injunctive relief than will the defendants from its issuance.

▉ Finally, we must decide against whom our injunctive order should run. We are unable to agree with the plaintiff that all of the named defendants should be named in the injunction. In our view the evidence is insufficient to show that the District or the International levels of the United Mine Workers had advance knowledge of, instigated, encouraged, prolonged, or failed to take adequate steps to end strikes in violation of the 1971 and 1968 Agreements. This conclusion is reinforced by the parties' stipulation that in all of the strikes except that of May 1, 1969, the International Union, upon being notified of the strikes by the plaintiff, immediately instructed the District to instruct the miners to return to work, and that the District immediately did so instruct the miners.

It is therefore

Ordered, that Local Union 9856 of the United Mine Workers of America, the officers and members of Local Union 9856 of the United Mine Workers of America, and all persons acting in concert and participation with them, be and they hereby are restrained and enjoined from engaging in a strike, work stoppage, interruption of work, or picketing at the Allen Mine of the CF&I Steel Company at Weston, Colorado, over disputes arising from employee suspensions, employee discharges, and work assignments, during the remaining life of the National Bituminous Coal Wage Agreement of 1971. Provided, that nothing herein shall be construed to require an individual employer to render labor or service without his consent, nor shall anything herein be construed to make the quitting of his labor by an individual employee an illegal act.

As a condition to this injunction, it is required that the CF&I Steel Company be willing to settle the disputes covered by this order in the manner provided by Article XVII of the National Bituminous Coal Wage Agreement of 1971.