**UNITED BROTHERHOOD OF CARPENTERS AND JOINERS OF AMERICA, AFL–CIO, MILLWRIGHTS AND MACHINERY ERECTORS, LOCAL UNION 1519, Plaintiff,**

v.

**BACKMAN SHEET METAL WORKS, INC., Sheet Metal Workers International Association, Local Union 98, and Sheet Metal Workers International Association, Defendants,**

v.

**TRI–STATE BUILDING AND CONSTRUCTION TRADES COUNCIL, International Association of Bridge, Structural and Ornamental Ironworkers, Local 769, AFL–CIO, and International Brotherhood of Boilermakers, Iron Shipbuilders, Blacksmiths, Forgers and Helpers, Local 105, AFL–CIO, Additional Defendants.**

No. C–1–82–755.

United States District Court,
S.D. Ohio, W.D.

Nov. 26, 1984.

Frederick G. Cloppert, Jr., Columbus, Ohio, for plaintiff.

Leonard Sigall, Reynoldsburg, Ohio, John Pinney, Cincinnati, Ohio, David Hols, St. Paul, Minn., Jonathan D. Schiller, Washington, D.C., Gary Eby, Cincinnati, Ohio, for defendants.

## FINDINGS OF FACT, OPINION, AND CONCLUSIONS OF LAW

CARL B. RUBIN, Chief Judge.

This matter is before the Court following the presentation of evidence and testimony at a trial to the Court. The alignment of parties in the caption of this case is such that some explanation is required. This matter was originally filed by the United Brotherhood of Carpenters and Joiners of America, AFL–CIO, Millwrights and Machinery Erectors, Local Union 1519 ("Millwrights") against Backman Sheet Metal Works, Inc. ("Backman"), and Sheet Metal Workers International Association, Local Union No. 98, and Sheet Metal Workers International Association ("Sheet Metal Workers") for declaratory judgment. Subsequently, the Tri-State Building and Construction Trades Council ("Tri-State"), the International Association of Bridge Structural and Ornamental Ironworkers, Local 769, AFL–CIO ("Ironworkers"), and the International Brotherhood of Boilermakers, Iron Shipbuilders, Blacksmiths, Forgers and Helpers, Local 105, AFL–CIO ("Boiler-

makers") were added as parties defendant. Backman asserted a counterclaim against the Millwrights under section 303 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 187 (1982) and cross claims against the Boilermakers, Ironworkers, and Tri-State for breach of contract under section 301 of the Act, 29 U.S.C. § 185 (1982). The matter was presented to the Court with Backman as de facto plaintiff and the other parties as defendants. This litigation arose out of a sub-subcontract held by Backman for the fabrication and erection of some equipment at an ethanol plant being constructed at Southpoint, Ohio. The case presents essentially a jurisdictional dispute among the unions for which Backman seeks damages. In accordance with Rule 52 of the Federal Rules of Civil Procedure, the Court does submit herewith its Findings of Fact, Opinion, and Conclusions of Law.

## I. Findings of Fact

(1) At sometime prior to 1981, the Pritchard Corporation ("Pritchard") was awarded a contract by Ashland Oil Co. to construct an ethanol plant at Southpoint, Ohio. A subcontract was awarded by Pritchard to the Continental Screw Conveyor Corporation ("Continental") to design, construct and install a grain conveyor system. A second subcontract was entered into between Continental and Backman wherein Backman was required to fabricate and erect dust collectors and spouts. No dispute has arisen among the parties regarding the fabrication portion of the agreement.

(2) A collective bargaining agreement was executed on November 15, 1981, between Pritchard (general contractor), Tri-State, and their affiliated unions, including the Boilermakers, Sheet Metal Workers, Ironworkers, and Millwrights. This collective bargaining agreement, termed the Project Agreement, covered all work to be performed at the Ashland ethanol plant. (*See* Backman Exhibit 3). Continental, as subcontractor to Pritchard, was signatory to the Project Agreement. It is undisputed that all of the parties before the Court were bound by the terms of the Project Agreement.

(3) The Project Agreement provides in pertinent part:

> 9.1 There shall be no strikes, work stoppages, or slowdowns of any kind for any reason against the Employers....
>
> . . . .
>
> 9.3 The Unions agree individually that if any Union, individual, or group of employees covered by this Agreement engage in picketing or any work stoppage on the job, the other Unions and employees shall consider such picketing or work stoppage as an unauthorized strike and will refuse to honor any picket line established. Failure of any Union or groups of employees to cross such unauthorized picket lines on this project shall be a violation of this Agreement....
>
> . . . .
>
> 10.1 The rules and regulations of the Impartial Jurisdictional Disputes Board or its successor board shall apply.
>
> 10.2 All Contractors shall hold pre-job and mark-up conferences with the Unions to clear up work assignments in which there is thought to be a difference in opinion.... The Contractor (or Subcontractor) who has the responsibility for the performance and installation shall make a specific assignment of the work in accordance with agreements or decisions of record.
>
> In the absence of such agreements or decisions of record, it is the employer's responsibility to make the assignment in accordance with Procedural Rules and Regulations of the Impartial Jurisdictional Disputes Board.
>
> 10.3 In the event a jurisdictional dispute arises after an assignment has been made, the business agents will first seek resolution of the dispute on the job.
>
> 10.4 In the event no resolution is possible, the respective International Union

and/or Impartial Disputes Board procedures shall follow.

. . . .

11.1 There shall be no lockout, or strike, or cessation, or slowdown of work due to grievances arising during the life of this Agreement. It is specifically agreed that in the event that any disputes arise out of the interpretation or application of this Agreement, exclusive of questions or jurisdiction on work, the same shall be settled by means of the procedure set out in this Article. . . .

(*Id.*).

(4) The Project Agreement was incorporated by reference into the subcontract between Backman and Continental. (*See* Backman Exhibit 2 at p. 2; Attachment Exhibit E). A draft of the contract between Continental and Backman was received by Backman in September, 1981, but was not signed by Backman at that time because it was not in final form. Backman's intention to perform the ethanol plant job was expressed in a letter dated September 11, 1981. (Backman Exhibit 4).

(5) Some months before the May 17, 1982 jurisdictional dispute, Backman had agreed to sign the Project Agreement but had not formally signed it because Continental had not sent it to Backman at that time. (Backman Exhibit 23). When Backman entered the job-site for the first time on April 28, 1982, the contract with Continental still had not been signed because several terms were still being negotiated, including total price, types of stainless steel, drain systems, and receiving pits.

(6) Backman made an assignment of work to the Sheet Metal Workers in its first pre-job conference held on May 7, 1982. The assignment of work to specific crafts is required by the procedural rules and regulations of the Impartial Jurisdictional Disputes Board, which state that "[t]he contractor who has the responsibility for the performance and installation shall make a specific assignment of the work which is included in his contract. . . ." (Backman Exhibit 45 at p. 4). The assign-

ment made by Backman met with vigorous opposition. The Boilermakers claimed 50% of the dust collector system, Ironworkers claimed all structural steel and unloading mechanical equipment, and Millwrights claimed interconnecting spouting, fans, and chutes. Mr. Crabtree, business agent of the Millwrights, stated at the meeting that Backman had violated Article 10.1 of the Project Agreement and recommended that Pritchard notify Tri-State that Backman should not be permitted on the job-site until the dispute was resolved.

(7) On May 10, 1982, Backman started construction at the ethanol plant. Pritchard subsequently asked Backman to stop working because of the disputed work with the Ironworkers, Boilermakers, and Millwrights. Backman left the site on May 11 after the trailer was unloaded and was not permitted on the site through May 14. Backman returned to work at the job-site May 17.

(8) A second pre-job conference was held on May 17 at Pritchard's request to resolve the disputed work assignments. At the meeting, Backman stood by its original assignment, as it was required to do, (*see* Backman Exhibit 45) and the Boilermakers, Ironworkers and Millwrights reasserted their original objections. Harsh words were exchanged at the meeting and a threat was made by Ellis Harmon, the Ironworkers' business agent, that "Sheet Metal Workers wouldn't touch any structural steel or there would be no Ironworkers on the job the next morning."

(9) It was alleged that the Boilermakers, Millwrights, and Ironworkers walked off the job on May 18 due to the jurisdictional dispute, resulting in a work stoppage. The work stoppage was unauthorized but not all participants were clearly identified. Like most such occurrences, the evidence was confusing and conflicting. A system of trade identification was used on the job with different colored hard hats identifying different crafts. While some doubt was cast upon the reliability of the hard hat identification, the Court notes that it was only the defendant unions who were direct-

ly affected by the job assignments. It is something less than logical to assert that members of unrelated crafts, having no interest whatsoever in the outcome of the jurisdictional dispute, would walk off of a job and lose income thereby. Ferris, a Backman employee, testified that he did not actually see either the Boilermakers or Millwrights leave the job-site, since there was a quarter-mile's distance from the site to the gate. However, Backman's Exhibit 11 confirms the fact that 43 Ironworkers and four Millwrights left the job-site at 11:00 a.m. on May 18, 1982.

(10) On the morning of May 19, 1982, there were thirty to forty men standing in the parking lot. Six Boilermakers were absent and five reported to work at 9:30 a.m.; one Millwright was absent and three were late; 23 Ironworkers were absent and 24 were late to work. (Backman Exhibit 12). These actions resulted in a work stoppage from the customary starting time of 8:00 a.m. until about 9:30 a.m.

(11) The Sheet Metal Workers (Backman Exhibit 7, 13–11) and Boilermakers (Boilermaker Exhibits L, M) contacted their respective international union representatives regarding the jurisdictional dispute in May and June, 1982. The Millwrights contacted its representative in late July, 1982, and the Ironworkers never requested assistance from its international representative. The dispute over the work assigned to the Sheet Metal Workers was never resolved by the international representatives of the unions.

(12) Backman was escorted off and ejected from the job-site on May 19, 1982, by Pritchard. The Court finds that Backman was removed because of the work stoppage by the unions.

(13) A third pre-job conference was held at Pritchard's request on June 15, 1982. An official pre-job conference was required to be conducted after Backman signed the Project Agreement. The same unions participated and Backman reiterated the work assignments. Both Harmon, of the Ironworkers, and Mauppin, of the Boilermakers, stated at the meeting that the work would not proceed as assigned by Backman.

(14) Backman returned to work on June 16, 1982. Another work stoppage occurred about 8:00 a.m. when thirty or forty workmen congregated around the area where Backman was working, with some people sitting on Backman's equipment and blocking the work. Harmon, of the Ironworkers, remarked to Ferris, of Backman, that what Backman was doing was disputed work and Backman should not be working on the project. Harmon stated "We'll see if you work or not" and "If you start today, there won't be enough ambulances to take you to the hospital." Ferris did not see Childers, the Boilermaker steward, or other people he knew to be Boilermakers in that group but he did see brown hard hats believed to be worn by the Boilermakers. Other testimony confirmed that although Boilermakers were working in the vicinity of where Backman was unloading, there were no Boilermakers in the group conducting the work stoppage. Likewise, no witness identified the Millwrights as appearing in the group. Ironworkers, however, were seen in the group and identified as leaving the area.

(15) Backman's contract with Continental was subsequently terminated, without explanation, as to only the installation section of the job. (Backman Exhibits 37, 38).

(16) A procedure had been established to dispose of such disputes through the use of the Impartial Jurisdictional Disputes Board. The procedural rules and regulations of that Board, which were binding on the parties, impose certain requirements on both the contractor and the union:

> The contractor who has the responsibility for the performance and installation shall make a specific assignment of the work which is included in his contract. . . . It is a violation of the plan for the contractor to hold up disputed work or shut down a project on account of a jurisdictional dispute.
>
> . . . .

In the event that there is any stoppage of work, or threat of stoppage or cessation of operations, arising out of a jurisdictional dispute following an assignment of work, the contractor shall notify immediately the Chairman, Impartial Disputes Board.... The agreement provides (Article VII, Section 1) that "during the existence of this agreement there shall be no strikes or work stoppages arising out of any jurisdictional dispute."

*When a contractor has made a specific work assignment, all unions shall remain at work* and process any complaint over a jurisdictional dispute in accordance with the procedures herein established by the Board. Any union which protests that a contractor has failed to assign work in accordance with the procedures specified above, *shall remain at work and process the complaint through its international office....*

(Backman Exhibit 45 at 4, 7, 8) (emphasis added).

## II. Opinion

■ The Court has jurisdiction over the suit for damages brought by Backman against the Millwrights under 28 U.S.C. § 1331 (1982), 29 U.S.C. § 185 and 29 U.S.C. § 187. *Harnischfeger Corp. v. Sheet Metal Workers International Association,* 436 F.2d 351, 353 (6th Cir.1970); *Vulcan Materials Co. v. United Steelworkers,* 430 F.2d 446, 458 (5th Cir.1970), *cert. denied,* 401 U.S. 963, 91 S.Ct. 974, 28 L.Ed.2d 247 (1971). Section 301 of the Labor Management Relations Act, 29 U.S.C. § 185, permits suit in federal court for breach of a contract between an employer and labor organization representing employees in an "industry affecting commerce." *Pickens-Bond Construction Co. v. United Brotherhood of Carpenters,* 586 F.2d 1234, 1242 (8th Cir.1978). At the outset, it is noted that the claims for violations of 29 U.S.C. §§ 158, 185, 187 are governed by federal law. *Local 20, Teamsters, Chauffeurs & Helpers Union v. Morton,* 377 U.S. 252, 257, 84 S.Ct. 1253, 1257, 12 L.Ed.2d 280 (1964); *Textile Workers v.*

*Lincoln Mills,* 353 U.S. 448, 77 S.Ct. 912, 1 L.Ed.2d 972 (1957). Backman seeks damages against the Boilermakers, Ironworkers, Millwrights, and Tri-State for breach of contract in failing to follow Article XI of the Project Agreement dealing with jurisdictional disputes, in violation of 29 U.S.C. § 185(a).

■ Section 301 of the LMRA confers jurisdiction on the Court over suits by or against labor organizations to enforce the terms of a collective bargaining agreement. Where, "[h]owever, ... the collective bargaining agreement provides for mandatory arbitration of some or all of the issues in the dispute, exhaustion of contractual remedies is normally required." *Hardline Electric, Inc. v. International Brotherhood of Electrical Workers, Local 1547,* 680 F.2d 622, 624–25 (9th Cir.1982), *cert. denied,* 459 U.S. 1170, 103 S.Ct. 814, 74 L.Ed.2d 1013 (1983). Whether the parties have agreed to arbitrate a particular dispute is a matter of contract construction for the Court. *See John Wiley & Sons v. Livingston,* 376 U.S. 543, 547, 84 S.Ct. 909, 913, 11 L.Ed.2d 898 (1964); *Atkinson v. Sinclair Refining Co.,* 370 U.S. 238, 241, 82 S.Ct. 1318, 1320, 8 L.Ed.2d 462 (1962); *United Steelworkers v. Warrior & Gulf Navigation Co.,* 363 U.S. 574, 582, 80 S.Ct. 1347, 1352, 4 L.Ed.2d 1409 (1960); *Salary Policy Employee Panel v. Tennessee Valley Authority,* 731 F.2d 325, 332 (6th Cir. 1984). "A national policy favoring arbitration does not authorize arbitration unless the contract so provides." *Retail Clerks International Association v. Lion Dry Goods, Inc.,* 341 F.2d 715, 719 (6th Cir. 1965), *cert. denied,* 382 U.S. 839, 86 S.Ct. 87, 15 L.Ed.2d 81 (1965).

Article XI, § 11.1 of the Project Agreement provides in pertinent part:

"It is *specifically agreed* that in the event that any dispute arises out of the interpretation or application of this Agreement, *exclusive of questions or [sic] jurisdiction on work,* the same shall be settled by means of the procedure set out in this Article [i.e., contrac-

tual arbitration provisions]." (Emphasis added).

Additionally, the Project Agreement delineates a mechanism for disposing of questions regarding work jurisdiction in Article X, separate from Article XI's grievance and arbitration provisions.

■ The general guidelines and presumptions announced in the *Steelworkers* trilogy [1] for ruling on arbitration are not germane to this analysis because, unlike the arbitration provisions addressed in the *Steelworkers* cases, the agreement before the Court contains an express provision excluding a particular subject from the arbitration procedures in Article XI. *Warrior & Gulf*, 363 U.S. at 585, 80 S.Ct. at 1354. In contrast, the disposition of the issue *sub judice* is based on the traditional principles of contract interpretation because we do not find the parties' intent in this matter inconclusive. The collective bargaining agreement fairly read as a whole, and attributing to the words their ordinary and reasonable meaning, leads the Court to conclude that the claim that a signatory party to the contract failed to follow the Article X provisions for jurisdictional questions falls within the exception to the arbitration clause of the agreement. *See Frederick Meiswinkel, Inc. v. Laborer's Union Local 261,* 744 F.2d 1374, 1376, 1377 (9th Cir. 1984); *Morgan Services, Inc. v. Local 323, Chicago & Central States Joint Board,* 724 F.2d 1217, 1223 (6th Cir.1984); *Bechtel Corp. v. Local 215, Laborers' International Union,* 544 F.2d 1207 (3d Cir.1976). Moreover, the defendants are unable to point to a specific provision of the contract to justify their claim that there has been no exhaustion of contractual remedies. *See e.g., International Union of Electrical, Radio & Machine Workers v. General Electric Co.,* 407 F.2d 253, 260–61 (2nd Cir.1968), *cert. denied,* 395 U.S. 904, 89 S.Ct. 1742, 23 L.Ed.2d 217 (1969); *International Union, United Automobile, Aerospace & Agricultural Workers v. Acme*

*Precision Products,* 521 F.Supp. 1358, 1361 (E.D.Mich.1981). It is clear from the language and provisions of the Project Agreement that the parties "specifically agreed" to exclude questions of work jurisdiction from the arbitration procedures of Article XI. (Backman Exhibit 3 at 21). *See, Frederick Meiswinkel, Inc.,* at 1376–1377. Accordingly, the Court has jurisdiction over the § 301 claim.

■ A valid contract existed between Continental and Backman at the latest by May 7, 1982, when Backman began performance under the contract. The Project Agreement was included by reference in the Continental contract. Article I, § 1.3 provides that "[e]ach subcontractor who performs work at the jobsite shall become signatory and a party to this agreement by signing the *Letter of Assent* attached hereto...." (Backman Exhibit 3 at 3).

"In choosing among reasonable meanings of a promise or agreement or a term thereof, that meaning is generally preferred which operates against the party who supplies the words or from whom a writing otherwise proceeds." Restatement (Second) of Contracts § 206 (1979). *See e.g., Semmes Motors v. Ford Motor Co.,* 429 F.2d 1197, 1206–07 (2nd Cir.1970). "Unless otherwise indicated by the language or the circumstances, an offer invites acceptance in any manner and by any medium reasonable in the circumstances." Restatement of Contracts, at § 30(2). It is noteworthy that the clause does not state that acceptance of the offer can be made *only* by signing the Letter of Assent. The language is more a suggestion rather than a limitation as to the manner of acceptance. *Id.* at comment b.

■ "In case of doubt an offer is interpreted as inviting the offeree to accept either by promising to perform what the offer requests or by rendering the performance, as the offeree chooses." *Id.* at § 32.

**1.** *United Steelworkers v. Enterprise Wheel & Car Corp.,* 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960); *United Steelworkers v. Warrior & Gulf Navigation Co.,* 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960); *United Steelworkers v. American Mfg. Co.,* 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960).

In this case, Backman choose to accept the offer by orally[2] promising to perform its contract with Continental or by beginning the performance bargained for on May 7, 1982. (*See* Backman Exhibit 23). Therefore, the Project Agreement was binding on the parties prior to the first pre-job conference held on May 7, 1982.

■ Turning to the issue of liability, Backman has the burden of proof in this case by a preponderance of the evidence. *Blue Diamond Coal Co. v. United Mine Workers*, 436 F.2d 551, 561 (6th Cir.1970), *cert. denied*, 402 U.S. 930, 91 S.Ct. 1525, 28 L.Ed.2d 863 (1971), *citing United Mine Workers v. Osborne Mining Co.*, 279 F.2d 716, 727 (6th Cir.1960). Before a union can be found liable for damages under § 301, the union's responsibility for the illegal actions must be established according to a recognized theory of liability. *Consolidation Coal Co. v. Local 1702, United Mine Workers*, 709 F.2d 882, 884 (4th Cir.1983), *cert. denied*, — U.S. —, 104 S.Ct. 487, 78 L.Ed.2d 683 (1983). The Courts recognize two theories of liability, the "mass action" theory and the "common law agency" theory. *Id.* There is no authority in the Sixth Circuit, however, for the proposition that a union may be held responsible for the "mass action" of its members. *Southern Ohio Coal Co. v. United Mine Workers*, 551 F.2d 695, 701 (6th Cir.1977), *cert. denied*, 434 U.S. 876, 98 S.Ct. 227, 54 L.Ed.2d 155 (1977). On the contrary, the rule we must apply is that a union may only be held responsible for the actions of its officers and agents if it authorized, participated in, or ratified the conduct. *Davis Co. v. United Furniture Workers*, 674 F.2d 557, 564–65 (6th Cir.1982), *cert. denied*, 459 U.S. 968, 103 S.Ct. 296, 74 L.Ed.2d 279 (1982); *see Complete Auto*

*Transit, Inc. v. Reis*, 451 U.S. 401, 415–16, 101 S.Ct. 1836, 1844–45, 68 L.Ed.2d 248 (1981).

■ The Court finds that plaintiff has failed to prove by a preponderance of the evidence that the Boilermakers breached the terms of the Project Agreement. Plaintiff has proven by a preponderance of the evidence that the Millwrights and Ironworkers breached the terms of the Project Agreement in failing to follow the Impartial Disputes Board procedures as required. (*See* Backman Exhibit 45 at 8).[3] Under the doctrine of *respondeat superior*, the Ironworkers and Millwrights are liable for the failure of their employees to "process the complaint through [their] international office." *See General Building Contractors Association, Inc. v. Pennsylvania*, 458 U.S. 375, 392, 102 S.Ct. 3141, 3150, 73 L.Ed.2d 835 (1982); *Shimman v. Frank*, 625 F.2d 80, 94 (6th Cir.1980); *Brown v. International Union, United Automobile Workers*, 512 F.Supp. 1337 (W.D.Mich. 1981), *aff'd*, 689 F.2d 69 (6th Cir.1982). The Court further finds plaintiff has proved by a preponderance of the evidence that the Ironworkers "authorized or ratified" the acts of its officers and agents in failing to remain at work and that they did not effectively renounce their officers' and agents' actions in violating the terms of the Project Agreement. *See Southern Ohio Coal Co.*, 551 F.2d at 701; *United States Steel Corp. v. United Mine Workers*, 519 F.2d 1249, 1256 (5th Cir.1976).

■ At the conclusion of trial, the Court granted defendant Tri-State's Motion for Directed Verdict. The standard to be applied in this Circuit in determining the propriety of granting or denying a directed

---

2. Section 301 of the Labor Management Relations Act, 29 U.S.C. § 185 (1982), applies to any written or unwritten agreement which purports to resolve controversies between employers and unions. *Doubarn Sheet Metal, Inc. v. Sheet Metal Workers*, 547 F.2d 221, 224 (3d Cir.1977), *citing, Plumbers Local 115 v. Townsend & Bottum*, 383 F.Supp. 1339, 1343 (W.D.Pa.1974), *aff'd mem.*, 521 F.2d 1399 (3d Cir.1975).

3. The relevant section of the exhibit reads: "When a contractor has made a specific work assignment, all unions shall remain at work and process any complaint over a jurisdictional dispute in accordance with the procedures herein established.... Any union which protests that a contractor has failed to assign work in accordance with the procedures ... shall remain at work and process the complaint through its international office."

verdict motion is whether the evidence is such that, without weighing the credibility of the witnesses or considering the weight of the evidence, there is substantial evidence from which the trier of fact could find in favor of the party against whom the motion is made. *Coffy v. Multi-County Narcotics Bureau,* 600 F.2d 570, 579 (6th Cir.1979). After reviewing the evidence in the light most favorable to Backman, it was clear that reasonable men could come to but one conclusion from the evidence, that the evidence presented by Backman was insufficient to establish a violation of § 301 by Tri-State. *Id.*

■ Once liability has been established, the plaintiff is entitled to recover all damages, including losses in profit and overhead, directly and proximately resulting from the violation of § 301. *Riverton Coal Co. v. United Mine Workers,* 453 F.2d 1035, 1042 (6th Cir.1972), *cert. denied,* 407 U.S. 915, 92 S.Ct. 2439, 32 L.Ed.2d 690 (1972). Plaintiff has the burden of proving what actual losses were suffered as a result of the breach. *Plastics Div., Tenneco Chemicals, Inc. v. Teamsters, Local 401,* 520 F.2d 945, 949 (3d Cir.1975). Once the fact of damage has been properly established, uncertainty as to its amount will not foreclose recovery. *Blue Diamond Coal Co.,* 436 F.2d at 561. In such a case, the Court may approximate the damages on the basis of just and reasonable inferences from the evidence. *Wagner Electric Corp. v. International Union of Electrical Workers,* 496 F.2d 954, 957 (8th Cir.1974).

Backman's overhead and profit are included as a single item in its bid. Backman's original bid of $605,766, which included $418,483 as costs, left an anticipated overhead and profit of $187,283. Backman actually received $300,374 in payment and incurred actual direct costs of $226,863 (this figure includes the expenses incurred as a result of the unions' activities). The anticipated overhead and profit less actual overhead and profit leaves $94,372, which is the loss in profit and overhead Backman claims. In addition, Backman claims $100,-000 in overhead and profit on jobs it bid for Continental and lost because of its termination from the project. Further, Backman claims $500,000 per year for three years for the losses it suffered resulting from its damaged business reputation.

There was no evidence presented to show that the expenses claimed by plaintiff were not incurred or were unnecessary. The Court finds that Backman has proved by a preponderance of the evidence that its reasonably certain loss of $94,372 in profits and overhead expenses on the contract was the proximate result of the unlawful actions of the unions. Backman has failed to prove that its loss on future Continental jobs and loss in sales attributable to its allegedly damaged reputation were proximately caused by the defendants, and the Court finds plaintiff's claims on these points to be speculative. Finally, plaintiff was not required to mitigate its damages by settling the issue out of court with Pritchard.

■ Backman also contends that the Millwrights violated 29 U.S.C. § 187, which states that it is unlawful for a "labor organization to engage in any activity or conduct defined as an unfair labor practice in section 158(b)(4) ...." 29 U.S.C. § 187(a). Section 158(b) provides in part:

It is an unfair labor practice for a labor organization or its agents—

(4)(i) to engage in, or to induce or encourage any individual employed by any person engaged in commerce ... to engage in, a strike or a refusal in the course of his employment to use ... or otherwise handle ... any ... materials ... or to perform any services; or

(ii) to threaten, coerce, or restrain any person engaged in commerce ..., where in either case an object thereof is—

(B) forcing or requiring any person to ... cease doing business with any other person....

(D) forcing or requiring any employer to assign particular work to employees in a particular labor organization or in a particular ... craft ... rather than to employees in another labor organization or in another ... craft....

The Millwrights are liable for the action of its organization or its agents in conducting an illegal secondary boycott if it authorized, participated in, or ratified the actions of its officers and agents. *Complete Auto Transit*, 451 U.S. 401, 417, 101 S.Ct. 1836, 1845, 68 L.Ed.2d 248 (1981); *Davis Co.*, 674 F.2d 557, 564–65 (6th Cir.1982). Plaintiff has failed to prove by a preponderance of the evidence that the Millwrights authorized or ratified the actions of its members in conducting the work stoppage in May, 1982.

 The general federal rule on prejudgment interest, applicable to this LMRA matter is that, in the absence of a statutory provision, the award of prejudgment interest is addressed to the discretion of the district court. *Equal Employment Opportunity Commission v. Wooster Brush Co. Employees Relief Association*, 727 F.2d 566, 579 (6th Cir.1984); *Oil, Chemical and Atomic Workers International Union, Local No. 4–447 v. American Cyanamid Co.*, 546 F.2d 1144, 1144 (5th Cir.1977). Backman is not entitled to prejudgment interest on its damage award because the Court finds that prejudgment interest on the sum is not necessary in order to fairly compensate the plaintiff.

 Backman has also requested that attorneys' fees be awarded in this case. It is well established under the "American Rule" that a prevailing party may not ordinarily recover attorneys' fees in the absence of legislative or contractual authorization for the fee award. *Shimman v. International Union of Operating Engineers*, 744 F.2d 1226, 1229 (6th Cir.1984); *see Alyeska Pipeline Service Co. v. Wilderness Society*, 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975). The "bad faith" exception to the American Rule, which provides for an award "when the losing party has acted in bad faith, vexatiously, wantonly or for oppressive reasons" is the basis upon which Backman claims entitlement to attorneys' fees. *Id.* at 258–59, 95 S.Ct. at 1622.

 The Sixth Circuit has recently addressed the issue of awarding attorneys'

fees in a labor case based on the bad faith exception, noting that there are three categories of bad faith:

(1) bad faith occurring during the course of the litigation;

(2) bad faith in bringing an action; and

(3) bad faith in the acts giving rise to the substantive claim.

*Shimman*, 744 F.2d at 1230. Backman has not provided any evidence indicating that the parties exhibited bad faith during the course of the litigation or in bringing the lawsuit. *See id.* at 1234. With regard to the last category, the Court in *Shimman* held "that the bad faith exception to the American Rule does not allow an award of attorneys' fees based only on bad faith in the conduct giving rise to the underlying claim." *Id.* at 1233. Therefore, Backman's claim for prejudgment interest is denied.

### III. Conclusions of Law

(A) This Court has jurisdiction over the case pursuant to 28 U.S.C. § 1331, 29 U.S.C. §§ 185, 187.

(B) Defendant Tri-State is entitled to a directed verdict in its favor.

(C) Plaintiff has failed to prove its case against the Boilermakers by a preponderance of the evidence.

(D) The Ironworkers and Millwrights are jointly and severally liable to Backman for $97,372 in damages, for violation of 29 U.S.C. § 185.

(E) Plaintiff has failed to prove that the Millwrights violated 29 U.S.C. § 187 by a preponderance of the evidence.

(F) Awards of prejudgment interest and attorneys' fees are not justified by the circumstances of the case. Backman is entitled to postjudgment interest on the judgment in accordance with 28 U.S.C. § 1961.

**IT IS SO ORDERED.**