**OIL, CHEMICAL & ATOMIC WORKERS INTERNATIONAL UNION, AFL–CIO LOCAL 8–898, Plaintiff,**

**v.**

**TEXACO REFINING & MARKETING, INC., Defendant.**

**Civ. A. No. 87–130 MMS.**

United States District Court, D. Delaware.

May 6, 1987.

Henry Heiman of Heiman and Aber, Wilmington, Del. (Warren J. Borish and James F. Runckel of Spear, Wilderman, Sigmond, Broish, Endy & Silverstein, Philadelphia, Pa., of counsel), for plaintiff.

Walter L. Pepperman, II of Morris, Nichols, Arsht & Tunnell, Wilmington, Del., for defendant.

## OPINION

MURRAY M. SCHWARTZ, Chief Judge.

Petitioner Oil, Chemical and Atomic Workers International Union Local 8–898 ("OCAW") filed for a preliminary injunction directing Texaco Refining and Marketing, Inc. ("Texaco") to permit employees to take single vacation days pending arbitration of a dispute over permissible vacation time under the collective bargaining agreement. An evidentiary hearing was held on April 1, 1987, as mandated by § 7 of the Norris-LaGuardia Act, 29 U.S.C. § 107, followed by briefing which concluded on April 20. The following constitutes the Court's findings of fact and conclusions of law required by Fed.R.Civ.P. 52(a).

## FINDINGS OF FACT

The parties entered into a collective bargaining agreement effective January 8, 1986, through January 31, 1988. The sections of the agreement relevant to the dispute are Articles X, XVI and XX. Article XVI, the Grievance Procedure, states, "This article provides the method for adjusting grievances. Under this agreement, grievances are defined as *disputes relating to an alleged breach of a provision of this agreement,* or disciplinary action, suspension, discharge or disqualification without good and sufficient cause." Docket ("Dkt.") 1, Appendix A. (Emphasis added). The procedure entails a four-step process, beginning with a meeting between the grievant and the immediate supervisor and culminating, when necessary, in binding arbitration by a Board of Review. Article XX provides,

### Benefit Plans

A. The presently existing Employee benefit plans, namely,

.   .   .   .   .

(7) Vacation Plan

.   .   .   .   .

are incorporated in and made a part of this Agreement subject to all the provisions of the Plans which will determine all questions arising under and in connection with the plans....

B. *No dispute, grievance or question arising from the application of or in connection with any of the above Plans will be subject to the arbitration procedure described in Article XVI* hereof, except that upon the request of any member of the Plans or his representative, any dispute concerning the following only as they apply, may be arbitrated in accordance with the provisions in Article XVI:

(1) Length of service.

(2) Pay class or normal rate of pay, whichever is applicable.

(3) Whether the computation of benefits was correct in accordance with the provisions of the above Plans as established by (1) and (2) above, and whether such benefits were paid.

It is expressly agreed that there shall be no strike, stoppage, or slowdown of work because of any dispute, grievance or question.

*Id.* (Emphasis added). Article X(B) of the collective bargaining agreement states, "Vacations shall be scheduled throughout the year in accordance with operating requirements and Vacation Rules posted throughout the refinery." *Id.*

In late 1985 OCAW and Texaco began negotiating the terms of the agreement. Texaco originally proposed eliminating all use of vacation days in increments of four days or less, a position the union successfully opposed. The parties signed a Memorandum of Agreement ("Memorandum") on February 10, 1986, that set forth the framework for the collective bargaining agreement. The latter agreement was signed on March 31, 1986. The provisions of the Memorandum and the collective bargaining agreement relating to vacations were separately negotiated, but the parties did not specifically address vacation scheduling at that time.

The relevant sections of the Memorandum on vacations are Articles IV, XXIV, and XXVII:

IV. *Benefit Plans*

The Union agrees that any pre-merger Getty benefit plans, policies and employee programs which may or may not have been included in any labor agreement, if not heretofore discontinued, shall be discontinued effective March 1, 1986.

It is further understood that Texaco's ... Vacation Plan ... shall apply to Bargaining Unit employees effective March 1, 1986.

\* \* \* \* \* \*

XXIV. *Vacations in Less Than One-Week Increments*

"Employees will be limited to a maximum of five days of vacation per year in increments of four days or less."

\* \* \* \* \* \*

XXVII. *Vacation Distribution*

Effective January 1, 1987, vacations in all areas of the plant shall be spread out over a 46 week period and vacations to be taken in 1988 shall be spread out over a full 52 week period.

Dkt. 1, Appendix B. The Memorandum also contains the exclusion from arbitration found in Article XX of the collective bargaining agreement. The parties agreed informally that Texaco would not enforce Articles IV and XXIV of the Memorandum during 1986, instead maintaining the old vacation plan in effect prior to the merger of Texaco and Getty Oil that became effective in February, 1984.

On September 15, 1986, Texaco issued the "1987 Delaware Control Laboratories Vacation Scheduling Plan" ("Scheduling Plan") that is at the heart of this dispute. Dkt. 8, Appendix A. The Scheduling Plan covers, *inter alia*, all Technology Services employees and Bottlewashers, who had not previously been governed by such plans. A 46–week period for scheduling vacations, mandated by Article XXVII of the Memorandum, runs from February 15 through December 31, 1987. The Scheduling Plan also provides that "[e]mployees will be per-

mitted to take a maximum of five (5) days of vacation in increments of four (4) days or less." *Id.* The right of an employee to take incremental days of vacation is limited, however, to the maximum number of employees permitted to be on vacation at any one time under the Plan. Affidavit of Patrick Lister, Dkt. 7; *see infra* note 2. Texaco also altered the formula for calculating the number of single vacation days available [1] and limited to four the maximum number of workers who could be on vacation at any one time.[2] This change made it virtually impossible for an employee to take a single day during the peak summer months. From January 1 through March 15, Control Laboratory personnel governed by the Plan took 31 vacation days in increments of four days or less, and an additional 34 days are scheduled the rest of the year.

On October 9, 1986, OCAW filed a grievance (# 86–55) concerning the inclusion of the Technology Services technicians and Bottlewashers under the Plan and the provision of February 15—December 31 as the 46–week vacation period for 1987. After being processed through the first three levels of the Article XVI Grievance Procedure, Texaco agreed to utilize the full 52–week period for vacation distribution in 1987, but refused to remove the technicians and Bottlewashers from the scheduling plan. OCAW then requested arbitration, and on February 27, 1987, the parties selected an arbitrator and scheduled a hearing on the

1. Prior to 1987, the company calculated the days available in the Control Laboratory on a seven-day week. The new scheduling plan utilizes a five-day week. The effect of the change is to eliminate excess days available for single day vacations if the maximum number of workers take a full week vacation. A full week vacation means the employee took all the five days that would normally be worked. For example, if only four employees are permitted to take vacations during a week, and the seven-day week applies, the total vacation days available is twenty-eight (7 days × 4 workers = 28 days). If four workers take a one-week vacation (i.e., 5 days), twenty days are utilized and eight remain for single day vacations. Use of the five-day week means only twenty days are available (5 days × 4 workers = 20 days). If the same four employees take a full week vacation, then single day vacations are barred in that week. The Control Laboratory operates on a seven-day work schedule, and the workers' schedules have variable days off. Plaintiff prepared the following table to illustrate the difference in single vacation days available between 1986 and 1987, assuming a four employee maximum for vacation days, and each takes a full week vacation.

| X = Vacation Day | M | T | W | T | F | S | S |
|---|---|---|---|---|---|---|---|
| Employee A | X | X | X | X | X | | |
| Employee B | | X | X | X | X | X | |
| Employee C | | X | X | X | X | X | |
| Employee D | X | | X | X | | X | X |
| Single days available 1986 | 2 | 1 | 0 | 0 | 1 | 1 | 3 |
| Single days available 1987 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

PX 1. Texaco did not inform OCAW of the change to a five-day week, and has not put the policy in any written form.

2. Section 5 of the Scheduling Plan provides: Selection within the assigned quarter is by Plant Seniority. Four employes [sic] will be permitted on vacation during 34 weeks of the year and three employes [sic] will be permitted on vacation during the remainder of the year. The total number of employees [sic] allowed off can include up to two from each of the Physical Test Section and the Chemical Analytical Section and one from each of the other sections.

Dkt. 8, Appendix A. By including the Technology Services workers and the Bottlewashers in the Scheduling Plan, Texaco further limited the number of single vacation days available because the pool of workers who will take full week vacations in increased.

The union also argues that the parties had previously negotiated the scheduling rules, and therefore Texaco's unilateral change constitutes a breach of the collective bargaining agreement. This issue goes to the merits of the dispute, and

grievance for June 18, 1987. The union filed a second grievance (# 86–60) on November 5, 1986, concerning the Plan's alleged failure to permit vacations in increments of four days or less. After the first three steps of the Grievance failed to achieve a satisfactory result, OCAW again requested arbitration of the dispute.

On March 6, 1987, Texaco notified Arthur Wilson, president of OCAW Local 8–898, that the company would not proceed to arbitration on either grievance, because the arbitrator did not have jurisdiction, citing Article XX of the collective bargaining agreement. On March 16, 1987, OCAW filed for a preliminary injunction to enjoin Texaco from implementing the Vacation Plan and an order to compel arbitration of the grievances.

## CONCLUSIONS OF LAW

Arbitration of disputes between employers and unions over the terms of a collective bargaining agreement is resolutely favored by the federal courts. The Supreme Court recognizes an exception to the Norris-LaGuardia Act's broad prohibition of injunctions in labor matters where judicial involvement is necessary to promote arbitration of disputes. *Boys Markets, Inc. v. Retail Clerks Union Local 770*, 398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970). A *Boys Markets* injunction compelling arbitration is only permissible where two conditions are met: 1) the underlying dispute is subject to mandatory arbitration under a collective bargaining agreement; *Buffalo Forge Co. v. United Steelworkers of America*, 428 U.S. 397, 96 S.Ct. 3141, 49 L.Ed.2d 1022 (1976); 2) the conduct that a party would enjoin threatens or frustrates the arbitral process agreed to by the parties. *Nursing Home & Hospital Union No. 934 v. Sky Vue Terrace*, 759 F.2d 1094 (3d Cir.1985). *See Retail, Wholesale & Department Store Union Local 1034 v. Doxsee Food Corp., Inc.*, 650 F.Supp. 861, 863–64 (D.Del.1986). Once the issue of arbitrability is determined, the petitioner "must satisfy the traditional requirements for injunctive relief by demonstrating a probability of success on the merits, irreparable injury if the injunction is denied, and that the balance of hardships favors the injunction." *Id.* (citing *Sky Vue*, 759 F.2d at 1098).

The Supreme Court enunciated four basic principles for determining the arbitrability of a dispute in *AT & T Technologies v. Communications Workers of America*, 475 U.S. 643, 106 S.Ct. 1415, 89 L.Ed.2d 648 (1986). Based on the teaching of the *Steelworkers Trilogy, Steelworkers v. American Mfg. Co.*, 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960), *Steelworkers v. Warrior & Gulf Navigation*, 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960), *Steelworkers v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960), the Court stated:

> 1) "[A]rbitration is a matter of contract and a party cannot be required to submit any dispute where he has not agreed so to submit."

> 2) "[T]he question of arbitrability—whether a collective-bargaining agreement creates a duty for the parties to arbitrate the particular grievance—is undeniably an issue for judicial determination."

> 3) "[I]n deciding whether the parties have agreed to submit a particular grievance to arbitration, a court is not to rule on the potential merits of the underlying claims."

> 4) "[W]here the contract contains an arbitration clause, there is a presumption of arbitrability in the sense that an order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute."

*AT & T Technologies*, 106 S.Ct. at 1418–19. In light of these governing principles, the present dispute requires the Court to determine the scope of the arbitration clause, and then whether the dispute at issue is expressly excluded from the grievance procedure by Article XX of the collective bar-

does not affect the analyses of whether the dispute is arbitrable.

gaining agreement. *See E.M. Diagnostic Systems, Inc. v. Local 169, Intern. Brotherhood of Teamsters,* 812 F.2d 91, 95 (3d Cir.1987).

The arbitration clause in the collective bargaining agreement is broad, stating that "grievances are defined as disputes relating to an alleged breach of a provision of this agreement." In *E.M. Diagnostic Systems,* the Third Circuit Court of Appeals held that "a claimed contract violation comes within the scope of an arbitration clause ... when the subject matter of the grievance is one that is within the *zone of interests* that have received protection in the collective bargaining agreement." *Id.* (Emphasis added). The alleged violation of OCAW members' vacation rights under Article X of the collective bargaining agreement and Article XXIV of the Memorandum fall within a protected zone of interest because the parties actively negotiated for the benefits provided by these provisions. The strong presumption in favor or arbitration, *AT & T Technologies,* 106 S.Ct. at 1419, requires that the initial question of whether the alleged breach is subject to the grievance procedure be answered affirmatively.

The effect of the express exclusion from arbitration in Article XX of the collective bargaining agreement of any disputes arising from the Scheduling Plan presents a closer question. The fundamental issue is whether the Scheduling Plan, which OCAW alleges violates Article X, falls within the exclusionary provision of Article XX. The union argues Article X specifically addresses vacations, was separately negotiated by the parties, and contains no exclusion from arbitration for breaches of that provision. If Article XX governs disputes arising under Article X, then, according to OCAW, the collective bargaining agreement's provision on vacations and Article XXIV's guarantee of five single vacation days are meaningless. The union's pivotal argument is that the apparent conflict between these sections of the collective bargaining agreement should be resolved by an arbitrator, not the Court.

In construing the terms of a collective bargaining agreement, the Court applies basic principles of contract law. Exclusionary clauses generally require the Court to consider two issues: first, is the clause ambiguous, and second, what is the scope of the exclusion. *See, Woodcrest Nursing Home v. Local 144, Hotel, Hospital, Nursing Home Union,* 788 F.2d 894, 898 (2d Cir.1986); *Kansas City Royals Baseball Corp. v. Major League Baseball Players Assn.,* 532 F.2d 615, 621 (8th Cir. 1976).

Given the strong presumption in favor of arbitration, the exclusion clause must be clear and unambiguous. *H.C. Lawton, Jr., Inc. v. Truck Drivers, Chauffeurs, & Helpers Local Union 384,* 755 F.2d 324, 328 (3d Cir.1985); *Controlled Sanitation Corp. v. District 128, Intern. Assn. of Machinists,* 524 F.2d 1324, 1328 (3d Cir.1975), *cert. denied,* 424 U.S. 915, 96 S.Ct. 1114, 47 L.Ed.2d 319 (1976). In reviewing the exclusion, the Court must look at the entire agreement and not simply the section in issue. In finding a particular exclusion ambiguous, courts have focused on conflicting terms in the collective bargaining agreement, *see H.C. Lawton, Jr., Inc.,* 755 F.2d at 328–29 (provision for arbitration of disputes over interpretation of contract directly contradicts exclusion clause), and language subject to differing interpretations. *See Intern. Union of Elevator Constructors v. National Elevator Industry, Inc.,* 772 F.2d 10, 13 (2d Cir.1985) (exclusion unclear as to whether all employee discharges covered, and meaning of "appeal" subject to different interpretations); *Local 1302, United Brotherhood of Carpenters & Joiners,* 534 F.Supp. 658, 662 (D.Conn.1982) ("term 'jurisdictional disputes' susceptible to different interpretations.").

Where the language of the exclusion is clear, then the courts will enforce it because a party may not be forced to arbitrate a dispute when it did not contractually agree to do so. *See Frederick Meiswenkel, Inc. v. Laborer's Union Local 261,* 744 F.2d 1374, 1377 (9th Cir.1984), *cert. denied,* 470 U.S. 1028, 105 S.Ct. 1394, 84

L.Ed.2d 783 (1985) (exclusion of jurisdictional disputes from arbitration clear); *Roadway Express, Inc. v. Teamsters Local 515*, 642 F.Supp. 116, 119 (N.D.Ga.1986) (exclusion of representation disputes clear); *Allied Oil Workers Union v. Ethyl Corp.*, 602 F.Supp. 555, 559 (M.D.La.1984) (exemption of supervisors from arbitration procedure clear); *United Brotherhood of Carpenters & Joiners v. Backman Sheet Metal Works, Inc.*, 598 F.Supp. 212, 219 (S.D. Ohio 1984) (exclusion of jurisdictional disputes clear); *Oil, Chemical & Atomic Workers v. Shell Oil Co.*, 555 F.Supp. 142, 144–45 (S.D.Tex.1982) (exclusion of health and safety regulations from arbitration clear). If the exclusionary provision is not ambiguous, then the court determines whether the alleged breach comes with its scope or falls under the arbitration provision. *See Woodcrest Nursing Home*, 788 F.2d at 898 (unambiguous exclusion covers "non-slotted" employees); *United Automobile Workers v. General Electric Co.*, 714 F.2d 830, 832 (8th Cir.1983) (although lack of available work decisions excluded from arbitration, grievance raised seniority issue, which is not excluded).

Article XX of the collective bargaining agreement is not ambiguous because the language is not susceptible to any conflicting interpretations. The union argues, however, that the alleged violation of Article X falls outside the scope of Article XX's exclusion. OCAW asserts the parties negotiated Article X and Article XXIV of the Memorandum separately, thereby removing those provisions from the exclusion. If the dispute is not arbitrable, according to the union, then the specific provisions on vacations in the collective bargaining agreement and the Memorandum are rendered meaningless.

The mere fact that the parties bargained over the sections concerning vacations does not necessarily demonstrate that Article X falls outside the exclusion. Article XX states that any grievance "in connection with" the Vacation Plan is not arbitrable. The Scheduling Plan, which limits the number of single vacation days available, is clearly connected to the Vacation Plan, as that Plan provides the general guidelines for scheduling, vacation pay, administration of the Plan, etc. Dkt. 8, Appendix B. It strains credulity to find that the Scheduling Plan is not a direct product of the overall Vacation Plan.[3] Moreover, Article X does not specifically address the issue of arbitrability. Article X(A) deals with the amount of vacation time available, based on seniority, while Article X(B) provides general guidelines for posting vacation selection schedules and rules. The terms of Article X do not exhibit any direct conflict with Article XX's exclusion.

The intent of the parties is clear that there are limited exceptions to the exclusion from arbitration. Article XX permits three types of disputes to go through the grievance procedure:

(1) Length of service.

(2) Pay class or normal rate of pay, whichever is applicable.

(3) Whether the computation of benefits was correct in accordance with the provisions of the above Plans as established by (1) and (2) above; and whether such benefits were paid.

Dkt. 1, Appendix B. The parties have provided that any other dispute under the Vacation Plan will be resolved by the Plan Administrator. The creation of an appeal process to the Plan Administrator demonstrates the parties contemplated that any disputes beyond those specifically enumerated would not be adjudicated outside the company.[4]

---

**3.** Article 7 of the Texaco Vacation Plan, Dkt. 8, Appendix B, provides the following general rule for vacation scheduling:

> 7.03 Ordinarily, an Employe [sic] will not be permitted to take his or her vacation in other than consecutive days. However, at the discretion of the Company, an Employe [sic] may be permitted to take his or her vacation on days which are not consecutive, but he or

she shall be entitled only to the same number of scheduled working days which would occur in his or her normal vacation period if his or her vacation were taken in consecutive days.

**4.** The union argues vigorously that the negotiation history of Article X, leading to a separate provision, is unique as compared to collective bargaining agreements between OCAW and Tex-

The failure to specifically extend the exclusion to disputes under Article X is not dispositive because the exclusion for all disputes "in connection with" the Plan clearly covers vacation scheduling disputes. The union's position, that Article X provides a *sub silento* arbitration right, does not comport with the broad language of the exclusion, which is not limited solely to issues arising under Article XX.[5] To read Article XX otherwise would ignore the clear meaning of the exclusion and effectively render meaningless the provision that any dispute "in connection with" the Vacation Plan is not arbitrable.

## CONCLUSION

The parties' collective bargaining agreement expressly excludes from arbitration disputes arising from the Vacation Scheduling Plan, which the company promulgated under the Vacation Plan. Because the dispute is not arbitrable, the Court will enter an order denying plaintiff's motion for a preliminary injunction.

aco at other plants. It asserts this demonstrates the parties' intent to arbitrate all vacation scheduling disputes. The record is unclear that other Texaco contracts do not explicitly treat vacation time. Mr. Patrick Lister, Texaco's chief negotiator for this agreement, stated only one other Texaco contract governs vacations in a separate provision, but all other agreements "speak to" the vacation issue. Transcript of April 1, 1987 Evidentiary Hearing at 222–23. Neither party was prepared to move other contracts into evidence at the April 1 hearing. Under this circumstance, the Court cannot draw any inference from the status of Article X as a separate provision because the evidence conflicts.

The union's exclusive reliance on the course of negotiations that produced Article X does not override the terms of the collective bargaining agreement. The Court must apply the language of the contract, and Article XX's clear meaning excludes arbitration of disputes "in connection with" the Vacation Plan. Article XX is "boilerplate" in Texaco collective bargaining agreements, but that cannot alter the analysis of the

contract's terms; otherwise, any term repeatedly used could be effectively read out of the agreement.

5. The union relies on *H.C. Lawton, Jr., Inc.* and *E.M. Diagnostic Systems* to support its argument that the provision of a separate section for vacations means any dispute arising under Article X is arbitrable. Neither case, however, is controlling. In *H.C. Lawton, Jr., Inc.*, the Third Circuit Court of Appeals reviewed a collective bargaining agreement with directly contradictory terms regarding arbitrable and excluded disputes. 755 F.2d at 328. The contract between OCAW and Texaco does not have any conflict between the written terms, only an alleged conflict based on the bargaining history. In *E.M. Diagnostic Systems*, the collective bargaining agreement did not have an express provision excluding disputes from arbitration, a very significant factual difference from this contract. 812 F.2d at 96.